441 A.2d 1201

**COMMONWEALTH of Pennsylvania**

v.

**Jerald SKLAR, Appellant.**

**COMMONWEALTH of Pennsylvania**

v.

**Jerald SKLAR, Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 22, 1982.

Decided March 10, 1982.

406

Marilyn J. Gelb, Philadelphia, court-appointed, for appellant.

Robert B. Lawler, Chief, Appeals Div., Asst. Dist. Atty., Alan J. Sacks, Philadelphia, for appellee.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY, McDERMOTT and HUTCHINSON, JJ.

OPINION OF THE COURT

FLAHERTY, Justice.

This case is a consolidation of two appeals from two separate convictions of murder of the first degree. In no. 984, on March 15, 1978, Jerald Sklar was convicted of murder of the first degree by a jury sitting in the Court of Common Pleas of the First Judicial District and now appeals from the judgment of sentence of life imprisonment for the murder of Edward Rauer. On April 8, 1978, Jerald Sklar

was convicted, in no. 987, of murder of the first degree by a jury sitting in the Court of Common Pleas of the First Judicial District and now appeals from the judgment of sentence of life imprisonment for the murder of Abraham Fishman. Post trial motions were denied in both cases. These appeals followed.

Appellant raises four issues relating to the admissibility of his confession and the propriety of the prosecution. Because the issues raised are identical in each case and are controlled by the same operative facts, our discussion of the issues here is dispositive of those issues in both appeals. The four issues raised are: (1) his statements to police should be suppressed because both the prosecution and the confessions were the fruits of a violation of federal immunity; (2) the lower court improperly denied Sklar's motion to suppress because he was questioned for an unreasonable time, rendering his confessions involuntary; (3) his statements to police should have been suppressed because he did not voluntarily waive his right to remain silent; (4) his statements to police should have been suppressed because police obtained the statements by deceit. After a thorough review of the record, we find these allegations without merit and affirm.

In no. 984, the evidence indicated that on June 23, 1972, shortly after midnight, police found the dead body of Edward Rauer in his taxicab on the corner of Ardleigh Street and Vernon Road in Philadelphia. He had been killed by a blast from a shotgun at close range. For approximately four years, this murder went unsolved.

Sklar's statement to police indicated that Edward Rauer was murdered by a contract killer whom Sklar hired on behalf of one Michael Selko. Selko was the beneficiary of a life insurance policy which Selko and Rauer had on each other as partners in a taxicab business, and Selko indicated to Sklar that it would be beneficial to him if Rauer were dead. Accordingly, Sklar contacted one James Brown and arranged for Brown to kill Rauer in exchange for $1,500.00. Selko agreed to the price. Sklar also told Brown where he might find Rauer's cab late at night and suggested that

Brown make it look like a robbery. Within two weeks of the formation of the murder agreement, Rauer was killed. Afterwards, Brown told Sklar that he "did the job" and made it look like a robbery. He got away by running to the house of a girlfriend or his mother, Sklar was not sure which. Sklar contacted Brown several times to reassure him that he would be paid, and ultimately Sklar received money from Selko, hundred dollar bills wrapped in foil, and paid Brown. Selko paid Sklar $400.00 and, as Sklar put it, his relationship with Selko was "solidified."

Relating to no. 987, the evidence showed that in the early morning hours of March 5, 1973 Abraham Fishman was found wounded on North Delaware Street in Philadelphia, shot twice in the back with a shotgun, lying face down beside the dead body of his German Shepherd dog. Fishman died from these wounds in January of 1974, and for more than three years police were unable to find the persons responsible for his death.

Sklar told police that Abraham Fishman was murdered by the same contract killer, James Brown, whom Sklar hired previously at Selko's request, to kill Selko's business partner, Edward Rauer. Later, Selko asked Sklar to hire Brown to kill Fishman because Fishman was pressuring Selko to repay a loan for at least $7,000 which Fishman had made to Selko at exorbitant rates. In response to Selko's request, Sklar contacted Brown and showed him where the killing might be done. After Fishman had been shot, Brown told Sklar that he had shot Fishman in the back with a shotgun and that he had killed Fishman's dog, but he had not had time to rifle Fishman's pockets for money because Fishman was still conscious and the sound of the shots had attracted attention. When Fishman was discovered, he had $5156.00 in cash on his person.

In June of 1976, Sklar, through his attorney, Daniel Preminger, approached the United States Attorney requesting that he be entered into the federal witness protection program in return for information concerning organized crime. Sklar had read that persons in the witness protection pro-

gram were given new identities and a fresh start in a new location. His plan, as he testified at trial, was to furnish bogus information to the United States Attorney with the expectation that the government would set him up in a small business in the West and would not discover that the information was false until Sklar was already established. In response to Sklar's overtures, J. Clayton Undercoffler, III, United States Attorney, wrote to Sklar's attorney, Daniel M. Preminger, as follows:

Daniel M. Preminger, Esquire
242 S. 13th Street
Philadelphia, Pennsylvania 19107
Dear Mr. Preminger:

Confirming our telephone conversation and our personal discussion concerning the potential federal witness whom you represent, I understand that you agree to have your client meet with Assistant Special Agent in Charge, Lee F. Laster of the Philadelphia Office of the Federal Bureau of Investigation. It is further understood that any statements made by your client to Assistant Special Agent In Charge Laster in the course of that interview will not be used against him in any criminal case. Rather, the purpose for this interview is to permit the Federal Bureau of Investigation to make an in depth evaluation of the preliminary information you have related to me. An evaluation is necessary in order to determine whether further action is required by the Government and whether your client's request for inclusion in the Witness Protection Program is appropriate.

Sincerely,
J. Clayton Undercoffler, III
United States Attorney

In the discussions which followed, Sklar volunteered information concerning two homicides, for which he was subsequently prosecuted and which convictions are the subject of these appeals, the victims of which were Edward Rauer and Abraham Fishman. He also volunteered information concerning a local FBI agent who was allegedly associated with

organized crime. Subsequently, polygraph examinations indicated that Sklar had been untruthful in his disclosures, and on October 12, 1976 David Marston, successor to Mr. Undercoffler as United States Attorney, wrote to Emmett Fitzpatrick, District Attorney of Philadelphia, copy to Mr. Preminger, indicating that the government would no longer be bound by its offer of immunity to Sklar:

Honorable F. Emmett Fitzpatrick
District Attorney
2300 Center Square West
Philadelphia, Pennsylvania 19102

Dear Mr. Fitzpatrick:

Jerold Alan Sklar, represented by Daniel Preminger, Esq., recently approached this office seeking federal immunity in exchange for disclosure of certain information concerning federal crimes. After investigation by the Federal Bureau of Investigation and a polygraph examination, we have determined that Mr. Sklar was not entirely truthful in his disclosures, and therefore it is our position that the offer of federal immunity to Mr. Sklar can no longer bind this office. However, because his disclosures do not provide the basis for any federal prosecution, we do not intend to take further action in this case.

During the course of his disclosures, Mr. Sklar also provided information concerning two homicides, in which "Eddie Rauer" and "Al Fisher" were named as victims. The polygraph examination also reveals discrepancies with respect to these allegations, but I wanted you to be aware of this information because of its possible relevance to prosecutions which might be considered by your office. Assistant United States Attorney Robert N. de Luca and FBI Agent William Perry are familiar with the facts of this case and would be happy to cooperate with your investigators.

Please let me know if I can be of further assistance. Kind regards.

Sincerely,
David W. Marston
United States Attorney

In response to this information, the district attorney requested the open files on the Rauer and Fisher [Fishman] homicides from the Philadelphia police. Sklar claims never to have been told prior to his arrest, that his federal immunity had been revoked.

Coincidentally, on October 18, 1976, six days after Marston's letter to the Philadelphia district attorney, Sklar was arrested on a charge of automobile theft. While Philadelphia police questioned Sklar about this matter, in which he denied complicity and which was not pursued beyond the initial questioning, Sklar volunteered that he had information concerning the death of a Dr. Paul Fried, and asked to speak with homicide detectives. Sklar also announced that he had immunity from the federal government, but would not say what the immunity concerned. Sklar was not a suspect in any other crime. He was questioned by several police officers, all of whom gave him *Miranda* warnings prior to questioning, and he ultimately furnished police with statements concerning the death of Dr. Fried, and the unsolved homicides of Edward Rauer and Abraham Fishman. Sklar was not arrested or detained during the questioning, and he volunteered these statements, as he testified at trial, in order to prod the United States Attorney into acting on his prior request for inclusion in the federal witness protection program.

Sklar's first claim is that trial counsel was ineffective in not arguing that Sklar's statements to police should be suppressed because both the prosecution and the statements were the fruits of information obtained by a violation of the federal government's immunity agreement. As a corollary matter, Sklar argues that the trial court erred in not granting a motion for arrest of judgment or a new trial.

Sklar approached the United States Attorney voluntarily and requested immunity from prosecution in return for information concerning organized crime. The United States Attorney sent Sklar's attorney a letter stating that "any statements made by [Sklar] . . . in the course of [the] interview will not be used against him in any criminal case."

When the United States Attorney learned that Sklar had lied during their discussions, he informed the Philadelphia district attorney and Sklar's attorney that his office was no longer bound by the original grant of immunity. This letter informed the district attorney for the first time that Sklar had voluntarily provided information concerning two homicides in which "Edie Rauer" and "Al Fischer" were named as victims. Police officials were aware that a communication from the federal government had been sent to the district attorney concerning the Rauer and Fisher [Fishman] murder cases.

The essence of Sklar's argument is that but for the United States Attorney's asserted illegal disclosure to the Philadelphia district attorney that Sklar had provided information concerning these homicides, he would not have been prosecuted for either murder. The claim, therefore, is that the prosecution and statements given police were fruit of an illegality, the claimed illegal disclosure by the United States Attorney.

In general, immunity statutes protect persons who are compelled to give testimony, from the use of the compelled testimony and evidence derived therefrom in subsequent criminal prosecutions. *Kastigar v. United States,* 406 U.S. 441, 443, 92 S.Ct. 1653, 1655, 32 L.Ed.2d 212 (1972). Neither immunity statutes nor the Fifth Amendment, however, "endow[s] the person who testifies with a license to commit perjury." *Glickstein v. United States,* 222 U.S. 139, 142, 32 S.Ct. 71, 73, 56 L.Ed. 128 (1911). Accordingly, the United States Supreme Court has upheld convictions for perjury committed during the giving of a compelled statement where the respondent's immunized statement was used at a subsequent prosecution for making false statements. *United States v. Apfelbaum,* 445 U.S. 115, 132, 100 S.Ct. 948, 958, 63 L.Ed.2d 250 (1980) (hereinafter *Apfelbaum*).

In the present case, however, Sklar was not compelled to testify. Rather, he initiated discussions with the federal authorities and voluntarily disclosed information in return

for immunity. However, the promise of immunity was premised on the assumption that his information be truthful. If the information were untruthful, there could be no immunity, for the basis of the grant of immunity would have been frustrated. As Mr. Justice Brennan has written, concurring in *Apfelbaum*, "affording the witness a right to lie with impunity would render the entire immunity transaction futile." 445 U.S. at 132, 100 S.Ct. at 958. Similarly, Messrs. Justices Blackmun and Marshall, also concurring in *Apfelbaum,* have written, "Perjury or the making of false statements under a grant of immunity thus violates a basic assumption upon which the privilege and hence the immunity depend." 445 U.S. at 135, 100 S.Ct. at 959.

In sum, Sklar's assertion that his prosecution and statement were tainted by an allegedly illegal disclosure must fail, for the condition upon which immunity had been granted—truthfulness—had not been met.

The United States Attorney did not contemplate fraud and an intent to abuse the grant of immunity when he wrote to Sklar's attorney stating that Sklar's statements would not be used against him. The granting of immunity from prosecution is an extreme, albeit necessary, measure of law enforcement. It is the bitter pill that society must, in some cases, swallow, in order to gather information to prosecute criminal activity. When an attempted abuse of the immunity grant becomes apparent, it is only proper that the granting official revoke the immunity. Therefore, the United States Attorney acted properly in this case when he declared that he would not be bound by the original offer of immunity and when he informed the district attorney of the subject matter of Sklar's disclosures. Even if there were no source of information independent of the United States Attorney's letter upon which to initiate questioning and subsequent prosecution, there was no illegality in the release or use of information Sklar gave the United States Attorney. It was not ineffective, therefore, for Sklar's attorney to have failed to argue the issue, since counsel is not expected to put forward meritless claims, *Commonwealth v. Roach*, 479 Pa.

528, 530–531, 388 A.2d 1056, 1057 (1978), and it was not error for the trial court to deny the motions for arrest of judgment and a new trial.

Sklar's second claim is that because he was questioned for an unreasonable period of time and not afforded a preliminary arraignment, his confessions were involuntary. Sklar was arrested in the early morning hours of October 18, 1976 on a stolen auto charge. Shortly after he arrived at police headquarters, while being questioned with respect to that charge, Sklar volunteered that he had information concerning the death of Dr. Fried and requested that he be allowed to speak with a homicide detective. Accordingly, he was transported to the homicide division, where he was questioned at various times during the 18th through the 21st of October, 1976.

In *Commonwealth v. Davenport*, 471 Pa. 278, 286–287, 370 A.2d 301, 306 (1977), this Court adopted a rule "under which the admissibility of any statement taken *while the accused is in custody* before preliminary arraignment is based on the length of the delay between arrest and arraignment." (Emphasis added). Sklar was not undergoing interrogation *in custody*, however, when he proffered statements concerning homicides. Rather, he gave the statements at his own request. That Sklar was not in custody is, in fact, borne out by his own testimony at trial in no. 987:

Q. Did anyone tell you anything with respect to your status as a suspect in the Fishman case?

A. They told me I wasn't. They told me that at any time I wanted to leave, I was free to go; I wasn't being arrested, I wasn't being charged, that they appreciated my cooperation. As a matter of fact, I was there, I would say the best part of a week. I used to leave at the end of the day and make an appointment to come in there the next morning at 10 o'clock or 11 o'clock, or one day it was 2:00 in the afternoon.... Nobody ever stopped me from going and nobody ever demanded that I come back the next day.

Sklar's assertion that his will was overborne by this "excessive period of police interrogation" is difficult to understand in light of the admitted absence of confinement and voluntariness of his participation in the questioning. It is even more difficult to understand in light of Sklar's own testimony as to the reason for his continued participation, knowing that he was free to go:

A. ... I realized that when the federal authorities figured out that I had lied to them, that then I could be in trouble for having given a false statement to the federal authorities. Then I figured I really better do something to get the ball rolling.

Q. At that time, were you aware of the status of the federal government's evaluation of the information you had given them in June of 1976?

A. No, not at all.

Q. Was it your belief at that time that there was still hope of inclusion in the program?

A. Absolutely. That is why I gave the statement to the police. I really figured if I could motivate them to do something, that it would motivate the federal authorities and they would have to do something.

Testimony in no. 984 by four police officers, involved at the various stages of Sklar's questioning, indicated that Sklar was free to stay or leave, to give statements or not to give them. He was not a suspect and was not detained. Sklar testified in no. 984 that he gave the statement to Philadelphia police because, "I was hoping I could use this as a needle to inject some speed into the federal people."

This is not a case in which the will of a person suspected of a crime has been overwhelmed by the tactics of police. It is rather, as aptly put by the Great Bard, a case of "the enginer hoist with his own petar." *Hamlet*, Act III, Scene iv, 1. 207. The rules which have evolved regarding the suppression of coerced confessions were never meant to be employed to protect persons who attempt to perpetrate fraud on law enforcement authorities, and who, when the

fraud fails, then attempt to claim that their voluntary statements were involuntary. The claim must be denied.

Sklar's third assignment of error is that the trial court erred in not suppressing his statements to police because even though Sklar received *Miranda* warnings, he did not understand that his statements could be used against him. Sklar does not argue that the *Miranda* warnings were defective, but only that they could not have been valid with respect to him since he mistakenly believed that he did not have to heed the warnings because of immunity.

Sklar received *Miranda* warnings when he was first questioned about the stolen car at about 4:30 a. m. on October 18, 1976. When he was moved to the homicide division, in response to his request to speak with homicide detectives, he was given *Miranda* warnings again. After this set of warnings, Sklar gave information concerning Fried's death. About 1:30 p. m. Sklar was given a polygraph examination during which he indicated that he had information concerning a burglary. Prior to questioning him about the burglary, police attempted to give Sklar another set of *Miranda* warnings, but Sklar declined, saying that they had done that before. When this statement was completed, Sklar then told police that he would tell them about "a couple other murders." Prior to taking yet another statement concerning these "other murders," police again gave Sklar *Miranda* warnings. At approximately 5:00 p. m., a statement concerning the Rauer murder was taken; at 7:20 p. m., after more *Miranda* warnings, a statement was taken concerning the Fishman murder. After this statement, Sklar was told that he was free to go. The next morning, Sklar was still in the police station, having voluntarily slept there because he had nowhere else to go, and he once again talked with police and once again received *Miranda* warnings. Following these warnings, he once again gave statements concerning the murders he had discussed the day before.

In *Commonwealth v. Weeden*, 457 Pa. 436, 322 A.2d 343 (1974), *cert. den.* 420 U.S. 937, 95 S.Ct. 1147, 43 L.Ed.2d 414 (1975), appellants claimed that they did not knowingly and

intelligently waive their rights when they gave statements to police concerning a shooting because they did not understand that a participant in a robbery during which a murder occurs may be guilty of murder. This Court denied the claim on the grounds that appellants had been charged with the murder and robbery of the victim, and that the police were not required to explain the intricate law of felony-murder to suspects, but only to give them *Miranda* warnings. Sklar, like appellants in *Weeden*, claims to have made a mistake as to the legal effect of his statements. Sklar knew that he could choose to say nothing to police. He was aware of his power to terminate any and all interviews with police. In fact, police officers repeatedly informed him of this right as well as his right to appointed or privately retained legal representation before every statement. Sklar, then, does not claim that he did not know that he had the power to say nothing or to be represented by an appointed or privately retained lawyer; he claims only that he did not know the legal consequences of making the statements which he desperately wanted to make because they were part of a fraud he desperately wanted to perpetrate.

*Miranda* warnings were intended to insure that persons in the custody of police are not compelled to testify against themselves in violation of the Fifth Amendment. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Miranda* was never intended as a mandate to police officers to give protracted legal advice to persons who are questioned. If this were required, hardly a statement given to police could survive a motion to suppress, for criminal appellants would always claim that the legal consequences of their prosecutions were improperly explained and that had they but known of these consequences, they would not have made any statements.

Apart from these considerations, it would be indeed bizarre in this case to decide that Sklar's statements should be suppressed on the theory that he did not understand that

he might be prosecuted on the basis of what he said. It was Sklar himself who perpetrated the deception that reduced his immunity to a nullity. A person who lies in the hopes of achieving immunity from prosecution perpetrates the fraud at his peril, and should not be shielded by his own deception when he claims that he did not listen to the *Miranda* warnings when they were given because he believed that his fraud had been successful. The United States Supreme Court has mandated that a specific form of warning be provided persons in police custody who are being questioned with respect to possible involvement in a criminal matter. Those specific warnings were given in this case and that is all that is required. The third claim is denied.

The fourth assignment of error is that Sklar's statements to police should have been suppressed because the police used trickery and deceit to obtain the statements by promising the defendant that he would not be arrested and by treating him like an informant in exchange for the confessions. However, four different police officers testified they stated to Sklar that his federal immunity, whatever it concerned, might not protect him from state prosecution. Once again, Sklar's own testimony corroborates the Commonwealth's evidence. In no. 987:

Q. Didn't Sergeant Funk and Detective Lyons tell you that they did not believe you had immunity from the murder charge?

A. Yes, they did say that.

Q. And why did you give the statement?

A. Well, the FBI had told me I had immunity. My lawyer had told me I had immunity. I had this letter with me, believing that I had immunity. So, I didn't really care what the cop had to say.

In no. 984:

Q. Mr. Sklar, the police told you you had no immunity, right?

A. My lawyer told me I did. The police told me I didn't.

The police not only cautioned Sklar not to rely on his supposed immunity, but they also gave proper *Miranda* warnings. The problem was not that police treated Sklar coercively or deceptively, but that he outsmarted himself by attempting to perpetrate a fraud even after he had been warned that his immunity might not protect him and that what he said might be used against him.

Sklar also argues that permitting him unescorted access to the homicide division, providing him with food and occasionally a place to sleep, and telling him that he would not be arrested were deceitful tactics which require the suppression of his confession. The record indicates that police did not immediately arrest Sklar because initially there was some doubt as to the status of his claimed immunity and later, after it was discovered that the immunity had been revoked, police determined that further investigation concerning Sklar's statements was required before any arrest would be made. The record is not clear on whether Sklar was told prior to questioning about the homicides that he would not be arrested at that time, but there was police testimony that Sklar was never told that the district attorney's office might choose not to proceed against him in order to get him to talk to police. It was well within the suppression court's discretion to disbelieve Sklar's self-serving claim that he was told that he would not be arrested. *Commonwealth v. Lutz,* 492 Pa. 500, 424 A.2d 1302 (1981). Furthermore, such a police statement would be inconsistent with repeated police warnings that Sklar's statements might be used against him.

Concerning the alleged deceit inherent in police "friendliness," it would be myopic to characterize as deceitful police helpfulness with respect to Sklar's physical comfort and his access to police officials. Sklar had volunteered information concerning homicides, and police did no more than provide an opportunity for him to make his statements.

Finally, it can hardly escape notice that Sklar's present claim that his will was overborne by police deceit, rendering his confessions involuntary, is inconsistent with his repeated claims that it was *he* who was in control of the situation, disregarding police warnings because he knew better, and concocting a false story for very definite and deliberate purposes. Sklar cannot have it both ways: he cannot be simultaneously deliberate and overborne by deceit. There was no error in failing to suppress Sklar's police statements on the basis of alleged police deceit.*

Judgments of sentence affirmed.

* In no. 984 we have also reviewed the following arguments and conclude that they are without merit: (1) trial counsel was ineffective because he failed to object to introduction of the pre-trial statement; (2) Sklar was denied a fair trial when the Commonwealth withheld a portion of a pretrial statement given to police by a Commonwealth witness; (3) it was error for the trial court not to send out certain exhibits with the jury; (4) there was an abridgment of the right of confrontation when Sklar's cross-examination of a newspaper reporter was improperly restricted; (5) pre-trial counsel was ineffective in permitting Sklar to give a newspaper interview; (6) the prosecutor committed misconduct in his closing argument; (7) trial counsel was ineffective for failing to argue that the evidence is insufficient because the Commonwealth did not prove that the co-conspirator committed the murder.

In no. 987 we have also reviewed the following issues raised by appellant and after a careful review conclude that they are without merit: (1) trial counsel was ineffective for failing to object to introduction at trial of the tape-recorded statement; (2) the trial court improperly restricted cross-examination of a newsman; (3) pre-trial counsel was ineffective for permitting Sklar to give a newspaper interview prior to trial; (4) the trial court improperly excluded the testimony of a *res gestae* statement of the victim; (5) the trial court improperly permitted the prosecutor to question the United States Attorney knowing he would assert a claim of privilege; (6) the prosecutor improperly asked a defense witness whether he had attempted to make a "deal" to testify against Sklar; (7) defense counsel was ineffective for failing to object to unsolicited testimony from the Commonwealth's rebuttal witness concerning other crimes committed by Sklar; (8) the prosecutor improperly expressed his belief as to Sklar's guilt in referring to the "con"; (9) trial counsel was ineffective in failing to argue proof of corpus delicti was insufficient and proof of the elements of murder was insufficient due to the Commonwealth's failure to prove that a co-conspirator actually committed the murder which Sklar admitted arranging and aiding (10) the trial court improperly permitted Sklar to be cross-examined as to

why he waited until trial to deny that his police statements were true.