555 A.2d 864

**William D'ELIA, Petitioner,**

v.

**PENNSYLVANIA CRIME COMMISSION, Respondent.**

Supreme Court of Pennsylvania.

Argued Oct. 24, 1988.

Decided March 6, 1989.

Charles P. Gelso, Wilkes–Barre, and Andrea F. McKenna, Deputy Atty. Gen., Harrisburg, for petitioner.

G. Alan Bailey, Chief Counsel, Pennsylvania Crime Com'n, Norristown, and Michael J. Reilly, Pittsburgh, for respondent.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION

ZAPPALA, Justice.

This is an appeal from an Order of the Commonwealth Court adjudicating the petitioner, William D'Elia, in civil contempt of court for violation of a prior order of the Commonwealth Court. The prior order enforced a subpoena of the Pennsylvania Crime Commission (Commission), which had granted the petitioner use-immunity and had required him to testify before the Commission. We have jurisdiction under 42 Pa.C.S. § 723(a).

This case began on February 8, 1988, when in connection with a Commission investigation into possible labor racketeering in the construction industry in general, and the Philadelphia Industrial Correction Center construction project in particular, the Commission issued a subpoena to the petitioner. The subpoena required the petitioner to testify before the Commission, and further requested the production of documents relating to his employment with Superior Fireproof Door and/or GTI/Superior (Superior). Those companies were involved in the construction of the Correction Center.

In response to the subpoena, the petitioner, through his attorney, notified the Commission that he intended to assert his Fifth Amendment privilege against self incrimination. Subsequently, on March 23, 1988, the Commission filed a petition in the Commonwealth Court seeking an order granting the petitioner use-immunity and compelling him to

testify. On April 12, 1988, the petitioner filed preliminary objections to this petition. Following a hearing the Commission's petition was dismissed without prejudice, for matters not germane to this appeal.

The Commission then filed a second petition, which contained substantially the same information as the first. The petitioner again filed preliminary objections and on May 12, 1988, after another hearing, this petition was granted. On that date the Commonwealth Court issued an order granting use-immunity to the petitioner, and directing him to appear and testify before the Commission at a time and place to be determined by the Commission.

On May 20, 1988, the Commonwealth Court's order was served on the petitioner with notice that the Commission had set a hearing date of June 2, 1988, for his appearance. On May 31, 1988, petitioner, through counsel, notified the Commission that he would not appear. On June 2, 1988, after the petitioner failed to appear, the Commission filed a petition to have him held in contempt. As a consequence a contempt hearing was scheduled for August 4, 1988.

Subsequently, the petitioner served three subpoenas on the Commission in an attempt to establish that the Commission was trying to harass and embarrass him, and that Commission witnesses had lied at the enforcement hearing. These subpoenas were in effect quashed by a Commonwealth Court order granting a Commission motion for a protective order. Petitioner was then adjudicated in civil contempt and this appeal followed.

In this appeal D'Elia raises three issues, to wit: whether the Commission subpoena sought information that was reasonably relevant to the purpose and authority of the Commission; whether a person is entitled to assert his Pennsylvania constitutional right against self incrimination notwithstanding the grant of use immunity; and whether the Commonwealth Court erred in refusing to enforce the subpoenas that were served on the Commission.

Petitioner's first issue is directed at the propriety of the Commission's inquiry. D'Elia contends that the Commis-

sion had no authority to subject him to an examination concerning his activities. We disagree.

■ Under the Pennsylvania Crime Commission Act, Act of Oct. 14, 1978, P.L. 876, No. 169 Section 1 *et seq.*, 71 P.S. § 1190.1 *et seq.* the Commission has the power and the duty "to inquire into organized crime and activities of persons engaged in or associated with organized crime." 71 P.S. § 1190.4(1). Pursuant to this mandate the Commission has the authority to conduct hearings and to subpoena witnesses so long as the testimony sought is reasonably relevant to the Commission's inquiry.

■ As noted at the outset, this case arises out of the Commission's investigation into possible organized crime involvement in the construction industry. Such an inquiry falls squarely within the Commission's statutory authority. Thus the only question is whether the subpoena at issue was enforceable.

In the case of *In re Semeraro*, 511 Pa. 584, 515 A.2d 880 (1986), we addressed the standard to be applied by a court at a subpoena enforcement hearing and held:

> " '[I]t is sufficient [to permit enforcement] if the inquiry is within the authority of the agency, the demand is not to indefinite and the information sought is reasonably relevant.' " .... " 'Reasonably relevant,' for the purposes of an investigatory body's subpoena power, means that there must be some evidence establishing that the testimony sought will likely touch upon the subject matter of the underlying investigation."

*Id.*, 511 Pa. at 587, 515 A.2d at 882. (citations omitted).

In *Semeraro* we also defined the scope of review to be applied to an enforcement court's determinations:

> [W]hether a subpoena shall be enforced rests within the judicial discretion of court [and].... [w]e will not disturb a discretionary ruling of a lower court unless the record demonstrates an abuse of discretion. So long as there is

evidence which supports the lower court's decision, it will be affirmed.

*Id.*

In the case *sub judice,* D'Elia was subpoenaed to testify before the Commission based on information linking him to organized crime. At the second enforcement hearing two agents of the Commission revealed this information. The first testified that he learned through law enforcement agencies involved in investigation of organized crime activities, and through several of his confidential informants, that D'Elia was a high ranking member of the Bufalino organization, a group known to the Commission to be involved in organized crime. The agent also testified that he had approximately four conversations with the construction superintendent for Superior, and that the superintendent had previously testified before the Commission.

According to this agent, the superintendent testified that he had hired the petitioner as a night watchman for the construction site of the Correction Center because the company was experiencing labor difficulties at the construction site and he was fearful that these labor difficulties were going to escalate. The labor difficulties in question included threatening phone calls made to the superintendent at work and at home, equipment on the job site being vandalized, and theft of tools from the job site. The superintendent further testified that after he hired the petitioner there were no more significant labor problems at the job site, although, despite having paid D'Elia approximately five thousand dollars for his services, he had no personal knowledge whether D'Elia was ever present at the job site.

Additionally, the agent testified that telephone toll records of the petitioner indicated that 153 toll calls were made from Leavenworth Federal Penitentiary, located in Leavenworth, Kansas, to the petitioner's home during the four month time period in which the labor problems were occurring and the petitioner was employed as a night watchman at the job site. Furthermore, prison records established that these calls were placed by Russell Bufalino, the

reputed boss of organized crime activity in the Scranton–Wilkes Barre area. The superintendent had also testified that some time prior to his hiring of the petitioner, the petitioner had introduced him to Russell Bufalino.

The second agent to testify at the enforcement hearing was the Executive Director of the Pennsylvania Crime Commission. After hearing expert qualification testimony, the court allowed him to testify as an expert on organized crime. He testified that he had information which led him to believe that the petitioner was a member of the Bufalino organization. The director further testified that based on his experience an accommodation would have had to have been made between the Bufalino organization and the Scarfo organization in order for the petitioner to have worked in Philadelphia on the construction of the Correction Center, which was in the Scarfo organization's territory.

The information sought by the Commission was relevant to petitioner's employment with Superior, and its connection, if any, to organized crime. Such information was reasonably related to the legitimate scope of the Commission's inquiry, and given the evidence linking petitioner to organized crime we find no abuse of discretion in the lower court's decision to enforce the subpoena.

■ The second issue is whether the use and derivative use immunity provided by 71 P.S. § 1190.6(d) is coextensive with the protection of Article I, Section 9 of the Pennsylvania Constitution, such that a witness so immunized may be required to testify before an independent commission that has neither legislative, executive, nor judicial powers, whose sole purpose is the gathering and disseminating of information about suspected criminal activity. A reference to history is instructive.

From the earliest foundations, the privilege against self-incrimination provided for in the Pennsylvania Constitution has been construed not literally, but broadly, in favor of the right it was intended to secure. In *Respublica v. Gibbs*, 3 Yeates 429 (1802), the defendant was indicted for an assault on an election official. The election judge had asked the

defendant's father, whom the defendant was assisting in going to the poll, several questions about his allegiance to the Commonwealth during the Revolutionary War. Though the father objected, he ultimately answered the questions and was permitted to vote. His son, however, had taken umbrage at the inquiry and raised his fist to the election judge and "used intemperate language," whence he was accused of intending to interrupt the election by threatening one of the officials.

In what would now be termed an interlocutory appeal, the defendant argued to this Court that because the questions asked by the election judge were illegal, it was their improper conduct that caused any interruption of the election. The defendant argued that even though various constitutional provisions and statutes might have removed any possibility of criminal punishment for persons' conduct during the war, there still remained the potential for other legal disabilities arising out of the answers to questions about one's allegiance or whether he had been attainted of high treason. Such questions were thus improper under Article 1, Section 9 of the constitutions of 1776 and 1790, which, the defendant contended, should be read broadly to mean that no question should be asked, the answer to which might tend to charge one with a crime or bring him into disgrace or infamy. The Commonwealth responded that the rule that no one is bound to accuse himself means that such questions only are forbidden to be put that might involve one in guilt or penalty.

It was in this context that our Court first addressed the meaning of the privilege against self-incrimination. We did not, however, explicitly refer to the text of Article 1, Section 9; instead we relied on the maxim, *neme tenetur seipsum accusare, (seu prodere),* [no one is bound to accuse himself, (betray himself)] which we indicated was "founded on the best policy and runs throughout our whole system of jurisprudence." 3 Yeates at 437. Interpreting this maxim, we wrote, "[t]he words *accusare* or *prodere* are general terms, and their sense is not confined to cases, where the answers

to the questions proposed would induce to the punishment of the party; if they would involve him in shame or reproach, he is under no obligation to answer them."

In *Galbreath's Lessee v. Eichelberger*, 3 Yeates 515 (1803), an action in ejectment was brought by three sisters, seeking an undivided three-eighths interest in land originally owned by their father. They contended that a deed for the land from the father to one of their brothers had been merely a means to preserve the title·in the family from the effects of two judgments, that their brother had taken the title as a trustee. The sisters sought to show the nature of the transaction by calling as a witness another brother, who had accepted a deed to other property under similar circumstances. The question before the Court was whether this latter brother could be compelled to testify about the nature of the transaction, where the argument being made was "that the father and sons combined together to defraud the creditors of the former...." 3 Yeates at 516. This Court "readily agreed that he was privileged from giving evidence, under the maxim cited," writing

> If it should even be conceded, that an indictment would not lie against the witness for agreeing to accept this deed, which though void against creditors, might yet be good against the grantor and his heirs, yet the combination itself was nefarious and immoral, and would justly subject every person concerned in it to ignominy and contempt, and was therefore within the construction of the maxim, as lately adopted in [*Gibbs*].

*Id.* We thereafter related this reasoning to the constitutional privilege, stating that "[t]o oblige the witness to be sworn under the circumstances of this case, would be in effect compelling him to accuse himself of an immoral act, *and a violation of his privileges as a citizen.*" *Id.* at 517 (emphasis added). To this latter clause was appended a margin note to "Pennsylvania constitution, art. 9 [sic], § 9. The accused cannot be compelled to give evidence against himself." *Id.*

The United States Supreme Court's examination of the extent of the Fifth Amendment privilege in *Counselman v. Hitchcock*, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892), occurred in the context of a challenge to an immunity statute. After reviewing the decisions on similar cases from several states, beginning with *Gibbs* and *Galbreath's Lessee*, the Court concluded that "no statute which leaves the party or witness *subject to prosecution* after he answers the criminating question put him, can have the effect of supplanting the privilege.... *[A] statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offense to which the question relates.*" 142 U.S. at 585–586, 12 S.Ct. at 206. (Emphasis added). In so holding, the Court gave assent to the doctrine of *Emery's Case*, 107 Mass. 172 (1871), which it had reviewed in some detail.

The Supreme Judicial Court of Massachusetts reasoned in *Emery's Case* as follows

> it is a reasonable construction to hold that it protects a person from being compelled to disclose the circumstances of his offense, the sources from which, or the means by which, evidence of its commission, or of his connection with it, may be obtained, or made effectual for his conviction, without using his answers as direct admissions against him. For all practical purposes, such disclosures would have the effect to furnish evidence against the party making them. They might furnish the only means of discovering the names of those who could give evidence concerning the transaction, the instrument by which the crime was perpetrated, or even the *corpus delicti* of the crime itself.... [N]o one can be required to forego an appeal to [the privilege's] protection unless first secured from future liability, and exposure to be prejudiced, in any criminal proceeding against him, as fully and extensively as he would be secured by availing himself of the privilege accorded by the constitution.... *[T]his cannot be accomplished so long as he remains liable to prosecution criminally for any matters or*

*causes in respect of which he shall be examined, or to which his testimony shall relate.*

107 Mass. at 182–85 (emphasis added).

For approximately eighty years, *Counselman* was understandably read to prohibit, as a matter of federal constitutional law, a grant of immunity as a means of compelling testimony unless it was complete transactional immunity, i.e., immunity from prosecution for any offense related to the subject matter of the immunized testimony. See, e.g., *Ullmann v. United States,* 350 U.S. 422, 438, 76 S.Ct. 497, 506–07, 100 L.Ed. 511 (1956) (transactional immunity statutes have "become a part of our constitutional fabric.") In *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), however, the United States Supreme Court held that transactional immunity was broader than was necessary under the Fifth Amendment, and that it was constitutionally sufficient if the grant of immunity proscribed the use of testimony or other information compelled under the immunity order and the use of any information derived directly or indirectly from such testimony or information. The Court further held that at any prosecution of a person who had been compelled to give evidence against himself by a grant of immunity, the prosecutor would have the burden of showing that its evidence was not "tainted" by the immunized testimony and was derived from an independent source.

The validity of a use and derivative use immunity statute like 71 P.S. 1190.6(d) vis a vis the state constitutional privilege against self-incrimination, authorizing a non-legislative, non-administrative body to compel testimony, is a question of first impression for this Court.[1] We have had

1. The Commission's argument that prior decisions have already resolved this question reads those decisions too broadly. The question in *Commonwealth v. Johnson,* 507 Pa. 27, 487 A.2d 1320 (1985), was whether a *defendant* could seek a court order granting use immunity to a witness. The Commonwealth responded that it was for the Legislature, not the courts, to decide whether use immunity was to be made available as a means of securing the testimony of a witness, and that the Legislature had limited to the Commonwealth the right to request an immunity order, 42 Pa.C.S. § 5947. As between these two

occasion to consider the constitutionality of predecessor immunity acts, which granted transactional immunity, e.g., the Act of November 22, 1968, P.L. 1080. We upheld the constitutionality of that act over a claim that it violated the state and federal privileges against self-incrimination. *Riccobene Appeal*, 439 Pa. 404, 268 A.2d 104 (1970); *In re Falone*, 464 Pa. 42, 346 A.2d 9 (1975); *In re Martorano*, 464 Pa. 66, 346 A.2d 22 (1975). Although certain dictum in *Falone* suggested that transactional immunity was "more extensive than was necessary to displace the privilege," that dictum was focused primarily, if not exclusively, on the Fifth Amendment and *Kastigar*, and provided no independent analysis of the scope of the privilege under Article 1, Section 9.

arguments, we agreed with the Commonwealth. Neither party, however, addressed the validity of use immunity as a matter of state constitutional law, and that question was not before the Court for decision.

Nor have we held that for all purposes Article 1, Section 9 and the Fifth Amendment are co-extensive. In most of the cases cited, e.g., *Commonwealth v. Sklar*, 497 Pa. 404, 441 A.2d 1201 (1982) and *In re Martorano*, 464 Pa. 66, 346 A.2d 22 (1975), the argument did not distinguish between the privileges. Though we made brief reference to Article 1, Section 9 in *In re Falone*, 464 Pa. 42, 45, n. 1, 346 A.2d 9, n. 1 (1975), the context makes it clear that we analyzed only the Fifth Amendment privilege as it had been made applicable to the states by the Fourteenth Amendment. We had no need to analyze the extent of the state constitutional privilege. Since the immunity statute involved granted transactional immunity, and this was clearly more than sufficient to supplant the Fifth Amendment privilege according to *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), our analysis shed no light on whether a lesser degree of immunity would be sufficient to displace the privilege as expressed in the state constitution, the question now before us.

Finally, *Commonwealth v. Kilgallen*, 379 Pa. 315, 108 A.2d 780 (1954), though it was decided on purely state constitutional grounds, involved an explicit *constitutional* exception to Article I, Section 9, compelling testimony in certain cases while providing use immunity, Article III, Section 32 (Constitution of 1874). We held, in effect, that the latter constitutional provision could not be invalidated as inconsistent with the former, but that it would be construed as providing an exception. It would seem that under the then-prevailing view of the Fifth Amendment, a claim that Article III, Section 32, violated the Federal Constitution by not requiring transactional immunity would have succeeded. This argument, however, was unnecessary to the defendant, who had been indicted on the basis of his compelled testimony, and thus in violation of Article III, Section 32 itself.

The privilege against self-incrimination has been contained in its present form in the Declaration of Rights of the Pennsylvania Constitution since the Constitution of 1874 was adopted, and in substantially the same form since the Constitution of 1790. Also contained in the Constitution of 1874 were two narrow exceptions to the rule that "the accused ... cannot be compelled to give evidence against himself...."

Article III, section 32 of the Constitution of 1874 provided:

Any person may be compelled to testify in any lawful investigation or judicial proceeding against any person who may be charged with having committed the offense of bribery or corrupt solicitation, or practices of solicitation, and shall not be permitted to withhold his testimony on the ground that it may criminate himself or subject him to public infamy; *but such testimony shall not afterwards be used against him in any judicial proceeding,* except for perjury in giving such testimony.... (Emphasis added).

Article VIII, section 10 of the 1874 Constitution provided:

In trials of contested elections and in proceedings for the investigation of elections, no person shall be permitted to withhold his testimony upon the ground that it may criminate himself or subject him to public infamy; *but such testimony shall not afterwards be used against him in any judicial proceedings* except for perjury in giving such testimony. (Emphasis added).

In these two narrow areas only—investigations of bribery or corrupt solicitation, and trials of contested elections and investigations of elections—*constitutional* exceptions to the privilege against self-incrimination were recognized and in each case *use* immunity was provided. Both of these constitutional exceptions were repealed by the sovereign will of the people on May 16, 1967.

As previously noted, at the time these provisions were repealed, in 1967, it was the long-accepted view that only complete transactional immunity from prosecution was an

adequate substitute for the protections provided by the federal Constitution's privilege against self-incrimination. Thus the repeal of Article III, section 32 and Article VIII, section 10, eliminating the two instances where testimony could be compelled if accompanied by a grant of use immunity, conformed to the state of the law on the scope of the privilege, that is, that only tranactional immunity sufficed to displace it. *Accord, Commonwealth v. Lenart,* 430 Pa. 144, 242 A.2d 259 (1968) (plurality) (use immunity, even when combined with "fruit of the poisonous tree doctrine" preventing use of evidence derived from tainted source, not co-extensive with privilege as interpreted in *Counselman v. Hitchcock* ). The question remains, however, whether the statutory provision for use and derivative use immunity, modeled after the federal provisions that received the approval of the United States Supreme Court in *Kastigar,* is co-extensive with the state constitutional privilege against self-incrimination. In the present circumstances, at least, we hold that it is not.

Many of the practical concerns about allowing a grant of use and derivative use immunity to supplant the privilege were expressed by Justice Brennan in his dissenting opinion in *Piccirillo v. New York,* 400 U.S. 548, 568, 91 S.Ct. 520, 530–31, 27 L.Ed.2d 596 (1971).

> In dealing with a single jurisdiction, we ought to recognize the enormous difficulty in attempting to ascertain whether a subsequent prosecution of an individual, who has previously been compelled to incriminate himself in regard to the offense in question, derives from the compelled testimony or from an 'independent source.' For one thing, all the relevant evidence will obviously be in the hands of the government—the government whose investigation included compelling the individual to incriminate himself. Moreover, this argument does not depend upon assumptions of misconduct or collusion among government officers. It assumes only the normal margin of human fallibility. Men working in the same office or department exchange information without carefully re-

cording how they obtained certain information; it is often impossible to remember in retrospect how or when or from whom information was obtained. By hypothesis, the situation involves one jurisdiction with presumably adequate exchange of information among its various law enforcement officers. Moreover, the possibility of subtle inferences drawn from action or non-action on the part of fellow law enforcement personnel would be difficult if not impossible to disprove.

The Attorney General, who intervened in defense of the constitutionality of the statute, argues that we ought not decide the question now, but should wait until D'Elia is prosecuted and the Commonwealth is put to its "heavy burden." We reject this proposition for several reasons.

First, as noted by Justice Douglas, dissenting in *Ullmann v. United States*, "[o]ne 'mischief' [to be prevented by the privilege] is not only the risk of conviction but the risk of prosecution.... The risk of prosecution is not a risk which the wise take lightly. As experienced a judge as Learned Hand once said, 'I must say that, as a litigant, I should dread a lawsuit beyond almost anything else short of sickness and of death.' See Frank, Courts on Trial (1949), 40." 350 U.S. at 443–444, 76 S.Ct. at 509. This expresses much the same concern given controlling weight long ago in *Emery's Case*. By invoking the privilege one retains the security that comes with knowing that the government is left to its own devices to ascertain illegality and produce evidence. If one is compelled to testify, though, that security vanishes entirely and the individual cannot help but wonder if he is now caught in an untraceable web of effects that might lead to the ordeal of a trial, regardless of how innocuous the questioning might appear. Only an immunity that prevents the risk of such ordeal can duplicate the effect of invoking the privilege.

Second, the nature of the Crime Commission calls for great circumspection in assessing the rights of citizens who may come within its investigative sweep. As we noted in

*In re Subpoena On Judicial Inquiry and Review Board,*
512 Pa. 496, 507, 517 A.2d 949 (1986),

> the Commission is merely an investigative body, without
> authority to prosecute anyone, having the function of
> making recommendations for legislative or administrative
> action ... Although by the nature of the subject matter
> of its grant of authority the Commission may come under
> the umbrella concept of the state's "interest in conducting
> law enforcement efforts," it is by no means the equal of
> other interests under that umbrella such as a grand jury,
> or a prosecutor...."

In that case, the Commission had served a subpoena on the
Judicial Inquiry and Review Board seeking the production
of records the Board refused to produce pursuant to the
constitutional mandate of confidentiality. In rejecting one
of the Commission's arguments, that access to the records
was essential to the Commission's fulfilling its function, we
wrote

> In view of the fact that the Commission need not meet
> any burden of proof as would a prosecutor trying a case,
> but need only prepare a report of its findings and recom-
> mendations, any evidence which the Commission can ob-
> tain through its own investigation can serve a purpose.
> The Commission errs in assuming that it cannot fulfill its
> duties without ferreting out *all* evidence before reporting
> to the Legislature or executive agencies. Even if the
> "best evidence" is unavailable, and the evidence which is
> available would not suffice to sustain criminal charges,
> the investigative/reporting function of the Commission
> can be served.

*Id.,* 512 Pa. at 508, 517 A.2d at 955.

Although it is entirely within the legislative prerogative
to extend to the Commission the right to seek an immunity
order as a means of carrying out its assigned function,
when measuring the limits of such an order against the
requirements of the constitution we cannot ignore the imba-
lance between the vast potential for harm that attends the

compelling of potentially incriminating testimony and the limited role of the Crime Commission.

Third, though we have no cause presently to explore the need or the propriety of reverting to the interpretations of *Gibbs* and *Galbreath,* which gave the constitutional right the same breadth as the common law maxim, thus insulating from inquiry matters that might subject one to infamy and public disopprobrium regardless of criminal sanctions, we find guidance in those decisions and the concern for the interests of our citizens they demonstrate. We have in our Constitution a fitting expression of the great importance our founders attached to a person's good name.

### Inherent Rights of Mankind

Section 1. All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of *acquiring, possessing and protecting* property and *reputation,* and of pursuing their own happiness. (Emphasis added). There is, in some respects, a greater danger than potential prosecution attaching to the compelling of potentially self-incriminatory testimony to a body such as the Commission. Were a prosecution to occur, the defendant would have the opportunity to explain and exonerate himself by the judgment of his peers on the assessment of properly submitted, legal evidence. No such opportunity would attend the filing of a report by the Commission, yet the extent of the exposure and the magnitude of the infamy that might follow on the mere assemblage of information untested by the fires of due process is enormous.

For all of the foregoing reasons, we hold that because the immunity order was inadequate to protect the witness's interests to the full extent of his Article 1, Section 9 right, he could not be found in contempt for failing to answer questions by relying on that right.[2] The Order of the Commonwealth Court is reversed.

**2.** Our resolution of this issue in favor of the petitioner makes it unnecessary to decide the third issue raised, whether the Common-

PAPADAKOS, J., filed a concurring opinion which also joined this majority opinion, in which NIX, C.J., and FLAHERTY and McDERMOTT, JJ., joined.

PAPADAKOS, Justice, concurring.

I join the majority opinion because I perceive its holding to apply only to situations arising before the Pennsylvania Crime Commission "which has neither legislative, executive, nor judicial powers [but] whose sole purpose is the gathering and disseminating of information about suspected criminal activity." Opinion, p. 231.

NIX, C.J., and FLAHERTY and McDERMOTT, JJ., join in this concurring opinion.

wealth Court erred in quashing the petitioner's subpoenas to the Commission, seeking information to demonstrate that the Commission's subpoenas to him were issued for an improper purpose.