NO. **93-006**

IN THE SUPREME COURT OF THE STATE OF MONTANA

**1993**

STATE OF MONTANA,

     Plaintiff and Respondent,

-vs-

PAUL MYRHOW,

     Defendant and Appellant.

FILED

DEC 0 6 1993

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Fifth Judicial **District,**
In and for the County of Jefferson,
The Honorable Frank M. Davis, Judge presiding.

COUNSEL OF RECORD:

     For Appellant:

     Gregory A. Jackson; Jackson & Rice, Helena, Montana

     For Respondent:

     Hon. Joseph P. Mazurek, Attorney General; Paul **D.**
Johnson, Assistant Attorney General Helena, Montana

     Joseph E. Thaggard, Special Deputy Jefferson County
Attorney, Helena, Montana

Submitted on Briefs:  July 1, 1993

Decided:  December 6, 1993

Filed:

_____
Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from the District Court of the Fifth Judicial District, Jefferson County, the Honorable Frank M. Davis presiding. Defendant Paul Myrhow (Myrhow) appeals the denial of his motion to dismiss for failure to state an offense. Myrhow contends that the State of Montana (State) granted him immunity from prosecution for deviate sexual conduct in exchange for his cooperation in the investigation of another sex offender. We affirm.

The issues are:

1. What was the scope of the agreement not to prosecute between the State and Myrhow?

2. Did the State grant Myrhow statutory immunity from prosecution for providing information which was used to convict a sex offender?

3. Did the District Court err by ruling that Myrhow could be convicted for deviate sexual conduct occurring prior to June 28, 1989?

During his school days in Boulder, Montana, Myrhow was one of several sexual abuse victims of Douglas Marks, a Boulder school teacher. In 1984, Myrhow, then 18, complained to Jefferson County Deputy Sheriff, D.D. Craft, about Marks' deviate sexual conduct with Myrhow and other adolescents. Later in 1984 or 1985, Myrhow approached Jefferson County Sheriff, Tom Dawson, with the same complaint.

By June 1989, Marks had not been charged with any crimes. At

2

that time, Myrhow met with Dr. Phillip Pallister, a family friend, revealing that Marks had molested him for years. He wanted to stop Marks from molesting other juveniles. On June 23, 1989, Pallister and Myrhow met with Allen LeMieux, the former Jefferson County Attorney and another of Myrhow's friends. After discussing Marks, they arranged a June 26th meeting with Rick Moe, the superintendent of schools. The meeting with the superintendent prompted a meeting with Jefferson County Attorney, Richard Llewellyn, on June 28, 1989. Attending that meeting were Myrhow, Pallister, LeMieux and Llewellyn.

What occurred during the June 28, 1989, meeting is in dispute. It is clear from the record that Myrhow, Pallister and Lemieux informed Llewellyn of their frustration with the progress of the Marks investigation. According to Pallister and Lemieux, tempers flared. Myrhow wanted Marks' deviate sexual activities stopped. He revealed his involvement with Marks and agreed to cooperate in the Marks investigation. However, Myrhow never revealed that he, too, was an offender.

Myrhow agreed to furnish Llewellyn with a list of twenty to twenty-five other victims, provided that he first secured the victims' permission and provided that he be granted immunity. Llewellyn denies that Myrhow ever mentioned the word *'immunity** at the meeting; however, Pallister, Lemieux and Myrhow testified that Myrhow asked for immunity and Llewellyn granted the request. Although the grant was not reduced to writing, Llewellyn informed Myrhow that Myrhow would not be excused for serious offenses, such as bank robberies or murders.

In exchange for furnishing the list of names, Llewellyn agreed not to prosecute Myrhow for certain activities which Llewellyn doubted were even offenses. Those activities were: 1) Myrhow's deviate sexual conduct with Marks; 2) Myrhow's voyeurism--covertly watching Marks perform deviate sexual acts with another adolescent; 3) Myrhow's conspiring to kill Marks by blowing him up with dynamite; 4) Myrhow's threatening Marks with a pistol; and 5) Myrhow's breaking into the elementary school and placing a tape recorder in the nurses' quarters to record conversations between Marks and other children.

At that meeting, Pallister voiced his concern that the Jefferson County Sheriff had not vigorously investigated Marks in the past. Therefore, Llewellyn suggested the investigation be turned over to the Montana Attorney General's office. At no point during that meeting or at any other time did Myrhow ever mention that he, too, had committed sexual offenses against adolescent males.

Llewellyn next contacted Sheriff Dawson, who arranged a meeting between Myrhow and Dan Skuletich of the Montana Department of Justice Criminal Investigation Bureau. Myrhow provided Skuletich with a list of about twenty names of persons who may have been sexually involved with Marks, most of whom were now adults. Myrhow never mentioned to Skuletich that he was, at that **time,** sexually abusing adolescent males or that he had been granted any type of immunity.

According to Skuletich, the investigation was progressing "very slowly" in August 1989. Dawson and Skuletich were

4

interviewing people from Myrhow's list, but most were now adults and the statute of limitations on them had passed. Therefore, they narrowed the focus of their investigation to younger persons on the list. In so doing, Dawson developed a **"profile"** for younger persons. He created an independent list of potential victims of Marks. To derive this list, Dawson perused school yearbooks and coordinated with the Departments of Family Services and Social and Rehabilitation Services.

While investigating Marks, Dawson received a phone call from Wanda Stout of the Department of Social and Rehabilitation Services. She provided Dawson with **J.P.'s** name, which Dawson added to his profile. Also on Dawson's independent list were C.G., J.G. and L.G. Myrhow did not provide Dawson with any of these names.

On October 17, 1989, Dawson and Skuletich interviewed **J.P.,** who related his belief that L.G. had been sexually involved with Myrhow. This was the first time that the investigators had reason to suspect that Myrhow himself may have been offending. J.P. indicated that J.G. and C.G. might also be sexually involved with Myrhow. Skuletich then interviewed L.G., who confirmed that Myrhow paid him to have sex at Myrhow's residence in 1988. According to **L.G.,** J.G. was also in the house at that time. Before speaking with J.P. and **L.G.,** Skuletich had never heard of J.G. or C.G., from Myrhow or anyone else.

Later that day, Skuletich and Dawson met with Myrhow at the sheriff's office. Skuletich advised Myrhow of the allegations against him. Myrhow abruptly departed. Because neither J.P. nor L.G. were molested by Marks, Skuletich and Dawson decided to

5

separate the Marks investigation from the allegations against Myrhow. Neither Skuletich nor Dawson ever interviewed J.G. or C.G.

Myrhow contacted Dawson in February 1990 to express his disappointment at the slow pace of the Marks investigation. At that time, Myrhow mentioned that he "could have" had sexual relations with adolescent males. Dawson asked if Myrhow wanted to discuss the subject, to which Myrhow replied, "I'm not sure if I have immunity." Dawson suggested that Myrhow get an attorney, and never again discussed immunity with Myrhow.

Ray Mills, J.G.'s grandfather, approached Myrhow in Helena, Montana, asking Myrhow to meet with him to discuss some personal matters involving J.G. Mr. Mills met with Myrhow and Dr. Pallister on December 1, 1989. At that time, Mr. Mills learned that Myrhow had molested J.G. Mr. Mills told Myrhow and Dr. Pallister about J.G.'s legal problems. Myrhow responded by writing a letter to the Fifth Judicial District Court on J.G.'s behalf, in which he accepted partial blame for J.G.'s conduct and admitted that he had sexually victimized J.G.

Mr. Mills contacted Donna Hale of Lewis and Clark Human Services in December 1990, telling her that Myrhow had sexually molested J.G. She relayed this information to Jefferson County Undersheriff Tim Campbell. Dawson then informed Campbell of the allegations concerning Myrhow, which Dawson and Skuletich had separated from the Marks investigation. Prior to this time, no investigation was focused on Myrhow.

Campbell interviewed J.G. and C.G. They related when and how Myrhow molested them. C.G. testified that Myrhow began molesting

him in 1988, when he was in the eighth grade, through May 1990. C.G. recalled having oral sex with Myrhow after February 19, 1990, the day on which Marks was arrested. It was stipulated that J.G. would testify that his sexual activity with Myrhow ended by the late fall of 1989, although he was uncertain of the exact termination date.

The State charged Myrhow by amended information with eight counts of deviate sexual conduct without consent. See § 45-5-505, MCA. Each count involved Myrhow's sexual contact with males under sixteen years of age. Counts I through V involved J.G. Counts VI through VIII involved C.G.

The five counts involving J.G. occurred on the following dates: Count I, May 20, 1989; Count II, early August 1989; Count III, early October 1989; Count IV, October 1989; and Count V, between December 15 and December 24, 1989. The remaining three counts involving C.G. occurred on the following dates: Count VI, between July 1 and August 31, 1989; Count VII, between December 1, 1989, and January 31, 1990; and Count VIII, between May 1 and May 27, 1990.

Myrhow moved to dismiss all charges. He alleged that the prosecution granted him immunity and agreed not to prosecute him in exchange for providing information in the Marks investigation. The District Court held an evidentiary hearing on November 27 and 29, 1991. On March 18, 1992, the District Court entered its findings of fact and conclusions of law, and an order denying Myrhow's motion to dismiss.

On May 22, 1992, Myrhow pled guilty to all charges pursuant to

a plea bargain, the terms of which are not stated in the record. The District Court rejected the plea bargain and granted Myrhow's motion to withdraw his guilty pleas. On October 28, 1992, Myrhow withdrew his motion and his guilty pleas were reinstated. Myrhow received a deferred sentence of six years, implementation of which is stayed during this appeal.

I

What was the scope of the agreement not to prosecute between the State and Myrhow?

Myrhow and the State recognize that Llewellyn contractually agreed not to prosecute Myrhow for the criminal acts which Myrhow communicated to Llewellyn during the June 28th meeting. An agreement not to prosecute is generally enforceable and is governed by principles of contract law. United States v. Irvine (9th Cir. 1985), 756 F.2d 708. The agreement may be express or implied. Section 28-2-103, MCA. Additionally, as here, the contract may be oral. See § 28-2-901, MCA. The language of the agreement must be read as a whole and given a reasonable interpretation. Irvine, 756 F.2d at 710-11.

Notwithstanding the statutory immunity issue, there is no dispute that a contractual agreement not to prosecute did, in fact, exist. The substantive issue before us is the scope of that agreement.

Testimony concerning the terms of the agreement was contradictory. Myrhow claims that Llewellyn granted Myrhow immunity for matters related directly and indirectly to the Marks investigation. Lemieux, present at the June 28th meeting,

8

testified that he thought that all sexual offenses committed by Myrhow were covered by the immunity.

However, the State argues that Llewellyn could not grant immunity for offenses of which he had no knowledge. At no point during the June 28th meeting; during meetings with Llewellyn, Skuletich, Dawson or Campbell: or when interacting with his friends-- such as Pallister and Lemieux--did Myrhow mention that he, too, had committed sexual offenses against adolescent males. Only after being confronted with the allegations did Myrhow admit to sexually molesting adolescents. Even then, as late as February 1990, Myrhow admitted to Dawson, "I'm not sure if I have immunity." A careful review of the record reveals that Llewellyn did not extend immunity to sexual offenses committed by Myrhow.

The District Court found that Myrhow never revealed to Llewellyn or his friends at the June 28, 1989, meeting or at any other time the fact that he had victimized juveniles. Moreover, the court found that Llewellyn did not grant Myrhow immunity for criminal acts committed by him against others after June 28, 1989. These determinations are well supported by the record, are not clearly erroneous and must, therefore, be upheld. See Montana Dep't of State Lands v. Armstrong (1992), 251 Mont. 235, 824 P.2d 255.

The District Court correctly found that Llewellyn granted Myrhow de facto immunity from prosecution for the following acts: a) the sexual relationship with Marks; b) the confessed voyeurism: c) the alleged burglary of the Boulder School; d) the alleged attempt to kill Marks with a gun or explosives; e) violation of

Marks' right to privacy: and f) act of intimidation of Marks. We note that the "immunity" to which the District Court refers is a limited, contractual, transactional immunity arising solely from the agreement not to prosecute--not from Montana's immunity statute.

II

Did the State grant Myrhow statutory immunity from prosecution for providing information which was used to convict a sex offender?

Myrhow contends he was granted immunity from prosecution for providing information used to convict Douglas Marks. According to Myrhow, immunity extended to his sexual offenses against adolescent males. Myrhow argues that his belief concerning the grant of immunity was manifested in his conduct. For example, he told several people he had been granted immunity, he discussed his offending with various people, and he wrote a letter to the court admitting his offending.

The statute on which Myrhow relies, § 46-15-331, MCA, provides in pertinent part:

> (1) Before or during trial in any judicial proceeding, a judge of the district or municipal court, upon request by the prosecutor or defense counsel, may require a person to answer any question or produce any evidence, even though personally incriminating, following a grant of immunity.
>
> (2) If a person is required to give testimony **or** produce evidence in accordance with this section in **any** investigation or proceeding, compelled testimony or evidence and any information directly or indirectly derived from such testimony or evidence may not be used against the witness in any criminal prosecution.
>
> (3) Nothing in this section prohibits a prosecutor from granting immunity from prosecution for or on account of any transaction, matter, or thing concerning which a

10

witness is compelled to testify if in the prosecutor's sole discretion it is determined that the ends of justice would be served.

Two types of immunity are referenced in this statute: use or derivative use immunity (in subsection 2) and transactional immunity (in subsection 3). Section 46-15-331, MCA, provides that immunity is only granted when a witness is compelled_ to testify by court order (emphasis added). In this case, Myrhow voluntarily appeared before Llewellyn at the June 28, 1989, meeting. Myrhow was later subpoenaed to testify as a potential rebuttal witness at Marks' sentencing hearing: however, he was never compelled to testify because he was not called as a witness at that hearing.

Myrhow and Llewellyn met at Llewellyn's office to discuss Myrhow's potential rebuttal testimony on November 6, 1990, the day before Marks' sentencing hearing. Because he believed he had no choice but to answer Llewellyn's questions, Myrhow argues he was compelled to tell Llewellynthat he was molesting adolescent males. However, Llewellyn neither summoned Myrhow for that meeting nor raised the issue of Myrhow's offending. Rather, Myrhow visited Llewellyn's office and raised the subject of his sexual abuse of the juveniles.

We determine that no compelled testimony resulted from the issuance of the subpoena. No controlling authority requires a different result. See Kastigar v. United States (1972), 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (analyzing statutory immunity in relation to 18 U.S.C. § 6002, a federal statute similar to § 46-15-331, MCA); United States v. North (D.C. Cir. 1990), 910 F.2d 843 (which, like Kastiaar, focuses on compelled testimony). We hold

11

that the State did not grant statutory immunity to Myrhow.

## III

Did the District Court err by ruling that Myrhow could be convicted for deviate sexual conduct occurring prior to June 28, 1989?

The State correctly characterizes the District Court's decision regarding Count I of the information as "somewhat obscure." The court ultimately concluded that no immunity was granted for any counts in the amended information. However, Count I of the information alleged deviate sexual conduct by Myrhow against J.G. on or about May 20, 1989. Count I was the only count of the information alleging conduct which occurred before June 28, 1989.

District Court Finding No. 13 reads as follows:

> The Court finds that all of the offenses alleged in the amended Information were committed subsequent to the June 1989 meeting. While Defendant denies this, it is at the very least an issue of fact on this point. These acts are not covered by any grant of immunity, actual, de facto, or otherwise. The State did not learn of one of the offenses until late 1990, and this from a therapist at the Department of Family Services. It had no relationship to the Marks investigation whatsoever. Moreover, the Court finds that the Defendant concealed the identity of some of his victims ([John] Does I-4) from the investigators, and [John] Does 1 and 2 advised the authorities on their own that they had been abused by the Defendant. Thus, as to at least two of the victims, the Defendant would be subject to prosecution even if he had been granted the immunity he claims.

The District Court later concluded:

> The Defendant is immune from prosecution for all alleged criminal offenses, sexual or otherwise committed by him prior to June 28th, 1989, insofar as such offenses may have been related to the investigation by the State in State v. Marks, Cause No. 1288.

12

Although the District Court concluded that no immunity was granted for offenses occurring after June 28, 1989, it also found (Finding No. 13) that Myrhow was granted immunity for all criminal offenses occurring prior to June 28, 1989. The District Court erred, in part, in Finding No. 13. The District Court incorrectly found that "all of the offenses alleged in the amended Information were committed subsequent to the June 1989 meeting." In fact, Count I was alleged to have been committed on or about May 20, 1989. Therefore, Finding No. 13 is clearly erroneous with regard to that count. See Steer, Inc. v. Dep't of Revenue (1990), 245 Mont. 470, 474, 803 P.2d 601, 603.

The question remains whether this is reversible error. We determine that the error does not affect the substantial rights of Myrhow. See Dahlin v. Holmquist (1988), 235 Mont. 17, 21, 766 P.2d 239, 241. The error is not reversible because Count I alternatively withstands challenge under the "independently derived evidence" doctrine. Unquestionable support for this position is found in the District Court's rationale:

> The State acquired this information [about the victims designated in this information] from independent sources . . . [t]his information had nothing whatever to do with the Marks investigation . . . all of the proposed evidence against this Defendant was derived independently of the massive Marks investigation.

The State correctly contends that the District Court recognized a basis for sustaining Count I: a defendant is not protected from the use of evidence "derived from a source independent of the immunized testimony." United States v. Crowson (9th Cir. 1987), 828 F.2d 1427, 1428-29. The State argues, and the record shows,

13

that Myrhow's offenses against J.G. and C.G. came to light independently of the Marks investigation and independently of any immunized evidence Myrhow provided through his agreement with Llewellyn.

Conversely, Myrhow contends that the State failed to meet its "heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." See Kastiaar, 406 U.S. at 461-62. Myrhow argues that because his investigation followed the Marks investigation, one must have necessarily led to the other. He contends that the information was not independently derived because Myrhow revealed his offenses against J.G. to Mr. Mills, which prompted Mr. Mills to contact Ms. Hale at the Department of Rehabilitation Services, who in turn contacted Undersheriff Campbell.

However, Myrhow never revealed to Llewellyn or investigators that he was a sexual offender or that he had sexually molested J.G. and C.G. That information arose from Dawson's and Skuletich's independent investigation. The mere chronological order of the investigations does not, in itself, provide any logical "use nexus" from the Marks investigation to the Myrhow investigation.

There is no evidence in the record to support the proposition that the State used information provided by Myrhow under the cooperation agreement to obtain the report from Ms. Hale. Moreover, Myrhow's communications with Mr. Mills were neither immunized by the agreement with Llewellyn nor presented to Llewellyn as the result of the use of any immunized evidence.

We hold that the evidence used to formulate Count I against

14

Myrhow was derived independently of the Marks investigation and independently of any immunized evidence Myrhow provided through his agreement with Llewellyn. The District Court correctly convicted Myrhow for deviate sexual conduct occurring before June 28, 1989.

Affirmed.

_____
Justice

We Concur:

_____
_____
_____
_____
Justices

December 6. 1993

CERTIFICATE  OF  SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:


Gregory A. Jackson
Jackson & Rice
833 North Last Chance Gulch
Helena, MT 59601

Hon. Joseph P. Mazurek, Attorney General
Paul D. Johnson, Assistant
215 N. Sanders, Justice Building
Helena, MT 59620

Joseph E. Thaggard
Special Jefferson Deputy County Attorney
215 N. Sanders, Justice Building
Helena, MT 59620


ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
Deputy