664 A.2d 957

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Patricia Ann SWINEHART.**

**Appeal of Thomas DeBLASE, Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 25, 1995.

Decided Aug. 29, 1995.

injury, I need not address the issue of whether she was in the course of her employment when the accident occurred.

Samuel C. Stretton, West Chester, for Thomas DeBlase.

Mary McNeil Killinger, Norristown, for Commonwealth.

Robert A. Graci, Harrisburg, for Attorney General's Office.

Before NIX, C.J., and FLAHERTY, ZAPPALA, CAPPY, CASTILLE and MONTEMURO, JJ.

## OPINION OF THE COURT

CAPPY, Justice.

This case presents the question of whether the use and derivative use immunity provided in 42 Pa.C.S. § 5947, is consistent with the Pennsylvania constitutional privilege at Article 1, Section 9, against compelled self-incrimination.[1] For

1. The pertinent portions of the immunity statute that are at issue provide:

 **(a) General Rule.**—Immunity orders shall be available under this section in all proceedings before:
 (1) Courts.
 (2) Grand Juries.
 (3) Investigating grand juries.
 (4) The minor judiciary or coroners.
 **(b) Request and issuance.**—The Attorney General or a district attorney may request an immunity order from any judge of a designated court, and that judge shall issue such an order, when in the judgment of the Attorney General or district attorney:
 (1) the testimony or other information from a witness may be necessary to the public interest; and
 (2) a witness has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination.
 **(c) Order to testify.**—Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding specified in subsection (a), and the person presiding at such proceeding communicates to the witness an immunity order, that witness may not refuse to testify based on his privilege against self-incrimination.
 **(d) Limitation on use.**—No testimony or other information compelled under an immunity order, or any information directly or indirectly derived from such testimony or other information, may be used against a witness in any criminal case, except that such information may be used:

the reasons that follow we find that use and derivative use immunity is consistent with the protection provided under our state constitution. Thus, for the reasons that follow, the judgement of the Superior Court is affirmed.

The issue before the Court arises from the investigation into the murder of David Swinehart on January 15, 1982. The appellant herein, Thomas DeBlase, is the nephew of the decedent. DeBlase was arrested and charged with the murder of Swinehart on May 11, 1985. DeBlase was originally called for trial on these charges in October of 1985. Prior to trial, DeBlase's motion to suppress evidence which was obtained through the use of a wiretap and body wire worn by his brother, Jeffrey DeBlase, was granted. The Commonwealth appealed the suppression ruling. The Superior Court reversed the trial court ruling on the suppression on September 22, 1986. This Court granted allowance of appeal and subsequently dismissed the appeal as having been improvidently granted on January 25, 1988.

DeBlase was again scheduled for trial on the murder charges on June 20, 1988. The motion to suppress the wiretap and bodywire evidence was renewed by DeBlase, and again granted by the trial court. The trial court granted the motion the second time relying on the *en banc* decision of the Superior Court in *Commonwealth v. Schaeffer*, 370 Pa.Super. 179, 536 A.2d 354 (1987), *aff'd by an equally divided court*, 539 Pa. 272, 652 A.2d 294 (1994). The Commonwealth again appealed from the suppression ruling to the Superior Court. The Superior Court reversed the trial court, relying upon the decisions of this Court in *Commonwealth v. Blystone*, 519 Pa. 450, 549 A.2d 81 (1988) *aff'd Blystone v. Pennsylvania*, 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990), and *Commonwealth v. Rodriguez*, 519 Pa. 415, 548 A.2d 1211 (1988).

(1) in a prosecution under 18 Pa.C.S. § 4902 (relating to perjury) or under 18 Pa.C.S. § 4903 (relating to false swearing);

(2) in a contempt proceeding for failure to comply with an immunity order; or

(3) as evidence, where otherwise admissible, in any proceeding where the witness is not a criminal defendant.

42 Pa.C.S. § 5947.

DeBlase filed a Petition for Allowance of Appeal from this second ruling by the Superior Court on the wiretap issue with this Court on April 24, 1989.

In January of 1991, while awaiting disposition of the Petition for Allowance of Appeal, DeBlase, who had been incarcerated since his arrest in May of 1985, filed with this Court an emergency petition for dismissal citing his constitutional right to a speedy trial as guaranteed under the United States and Pennsylvania Constitutions and pursuant to Rule 1100, Pa. R.Crim.P. On May 15, 1991, DeBlase filed a Petition for Habeas Corpus in the United States District Court for the Eastern District of Pennsylvania. The United States District Court ordered DeBlase released on bail subject to electronic home monitoring in November 1991.

On December 2, 1992, the United States District Court rendered a report and recommendation that DeBlase's Writ of Habeas Corpus be granted and all charges dismissed if he were not tried within 120 days of said report. DeBlase and the Commonwealth both filed objections to the report and recommendation. Upon consideration of the objections, the District Court subsequently denied the Writ of Habeas Corpus but found probable cause existed to appeal. A Notice of Appeal was filed with the Third Circuit Court of Appeals. The Appeal in the Third Circuit was ultimately discontinued.

Subsequent to the activity in the District Court on the Writ of Habeas Corpus, this Court on December 28, 1992 denied DeBlase's Petition for Allowance of Appeal from the opinion of the Superior Court regarding the suppression of the wiretap and body wire evidence, without prejudice, and dismissed his emergency petition for dismissal pursuant to Rule 1100 as moot.

Thereafter DeBlase was again brought before the Court of Common Pleas of Montgomery County on the homicide charges. On April 19, 1993, after hearing argument on pretrial motions, the trial court dismissed all charges against DeBlase finding that his right to a speedy trial under the Fifth, Sixth and Fourteenth amendments of the United States

Constitution, and Pa.R.Crim.P. 1100, had been violated.[2] On January 7, 1994, the Superior Court reversed the trial court ruling on the speedy trial issue and remanded the case back to the Court of Common Pleas. DeBlase petitioned this Court for Allowance of Appeal, which was granted.[3]

In the meantime, on July 28, 1992, Patricia Swinehart, the wife of the decedent, was arrested and charged with the murder of her husband, and with being a co-conspirator of DeBlase. DeBlase was subpoenaed as a witness in the Patricia Swinehart trial and offered a grant of immunity pursuant to 42 Pa.C.S. § 5947 (hereinafter "the Act"). DeBlase moved to quash the subpoena and objected to the grant of immunity. A hearing was held on the motions on January 19, 1994. The trial court refused to quash the subpoena, approved the grant of immunity to DeBlase, and then when DeBlase still refused to answer, found him to be in both civil and criminal contempt.

Pursuant to the Act, DeBlase was sentenced to a period of incarceration of 5 months and 29 days on the criminal contempt and was advised that he could purge himself of the civil contempt whenever he chose to testify in the Commonwealth's case against Patricia Swinehart. The trial of Patricia Swinehart began the next day and concluded in a not guilty verdict. Thus, DeBlase now has no opportunity to purge himself of the civil contempt. However, as he is still suffering under the onus of a criminal conviction the matter is not moot and shall be fully reviewed by this Court.[4]

**2.** It was following this ruling by the trial court that DeBlase discontinued his appeal on the Writ of Habeas Corpus in the Third Circuit Court of Appeals.

**3.** The Appeal on that issue was submitted to this Court on briefs on October 7, 1994 at No. 52 Eastern District Appeal Docket 1994. The issues raised within that case are not addressed in the present opinion.

**4.** We note that although the civil contempt is now incapable of being purged, this Court will still review the consequences flowing therefrom as such rulings, due to their very nature, are of substantial concern to this Court yet are capable of evading appellate review. *Colonial Gardens Nursing Home, Inc. v. Bachman,* 473 Pa. 56, 373 A.2d 748 (1977).

 Having traced the extraordinarily indirect route which brought DeBlase once again to this Court, we will now turn to the substantive issue to be resolved in this case. Simply put, DeBlase asserts that the Act, which grants an immunized witness use and derivative use immunity, offers insufficient safeguards in exchange for the considerable protection guaranteed under Article I, Section 9 of the Pennsylvania Constitution which the immunized witness is forced to forsake. DeBlase acknowledges that the United States Supreme Court has upheld use and derivative use immunity as sufficient protection under the Fifth Amendment to the United States Constitution in *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). He argues, however, that the Pennsylvania Constitutional protection is broader and can only be satisfied by a grant of transactional immunity.[5]

 We begin our analysis of this issue by setting forth our standard of review. Duly enacted legislation carries with it a strong presumption of constitutionality. *Commonwealth v. Parker White Metal Co.*, 512 Pa. 74, 515 A.2d 1358 (1986). The presumption of constitutionality will not be overcome unless the legislation is clearly, palpably, and plainly in violation of the constitution. *Commonwealth v. Blystone*, 519 Pa. 450, 549 A.2d 81 (1988), *aff'd Blystone v. Pennsylvania*, 494

5. Generally three types of immunity are recognized, although some scholars treat "use" and "use and derivative use" immunity as one and the same. *See* Leonard Sosnov, *Criminal Procedural Rights Under the Pennsylvania Constitution: Examining the Present and Exploring the Future*, 3 Widener Journal of Public Law 217 (1993). "Use" immunity provides immunity only for the testimony actually given pursuant to the order compelling said testimony. "Use and derivative use" immunity enlarges the scope of the grant to cover any information or leads that were derived from the actual testimony given under compulsion. Thus, under either "use" or "use and derivative use" immunity a prosecution against the witness is not foreclosed; any prosecution must, however, arise from evidence unrelated to the information which is derived from the witness' own mouth. "Transactional" immunity is the most expansive, as it in essence provides complete amnesty to the witness for any transactions which are revealed in the course of the compelled testimony. *See Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); *Commonwealth v. Johnson* 507 Pa. 27, 487 A.2d 1320 (1985).

U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990). Further, as to the specific claim that the Pennsylvania Constitution provides greater protection than the United States Constitution, this Court stated in *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991), that when reviewing such a claim

> [h]ere in Pennsylvania, we have stated with increasing frequency that it is both important and necessary that we undertake an independent analysis of the Pennsylvania Constitution, each time a provision of that fundamental document is implicated. Although we may accord weight to federal decisions where they "are found to be logically persuasive and well reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees," *Commonwealth v. Tarbert*, 517 Pa. 277, 283, 535 A.2d 1035, 1038 (1987), *quoting*, Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv. L.Rev. 489, 502 (1977), we are free to reject the conclusions of the United States Supreme Court so long as we remain faithful to the minimum guarantees established by the United States Constitution.

*Edmunds*, 526 Pa. at 389–390, 586 A.2d at 894–895.

█ █ Having properly established the degree of scrutiny under which we must consider the arguments raised, we find that the four-pronged method of analysis established in *Edmunds* to be the most thorough manner of accomplishing our task.[6] Accordingly, we will begin our analysis with a review of the text of the constitutional provision at issue, the history of that provision as related through legislative enactments and prior decisions of this Court, related case law from our sister states, and finally, policy considerations which include matters unique to our Commonwealth. *Edmunds*, 526 Pa. at 390, 586 A.2d at 895.

6. In *Edmunds,* this Court set forth certain factors that we found helpful in our analysis therein. We reiterate, the factors set forth are **helpful.** The failure of a litigant to present his state constitutional arguments in the form set forth in *Edmunds* does not constitute a fatal defect, although we continue to strongly encourage use of that format.

*I. Text*

Article I, Section 9 reads as follows, with the phrase at issue highlighted:

> In all criminal prosecutions the accused hath a right to be heard by himself and his counsel, to demand the nature and cause of the accusation against him, to meet the witnesses face to face, to have compulsory process for obtaining witnesses in his favor, and, in prosecutions by indictment or information, a speedy public trial by an impartial jury of the vicinage; **he cannot be compelled to give evidence against himself,** nor can he be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land. The use of a suppressed voluntary admission or voluntary confession to impeach the credibility of a person may be permitted and shall not be construed as compelling a person to give evidence against himself.

The privilege against compelled self-incrimination has been included in the Pennsylvania Constitution since 1776. The original provision in the 1776 Constitution was worded "no man can be compelled to give evidence against himself." Although the language was slightly modified between 1790 and 1838, the alteration was stylistic only, and the phrase has read as highlighted since 1838.

The last sentence of Section 9 which speaks to the use of suppressed confessions was added to the Constitution in 1984. The legislative debate which culminated in this amendment reveals that the amendment was a response to the decision of this Court in *Commonwealth v. Triplett,* 462 Pa. 244, 341 A.2d 62 (1975). In *Triplett,* this Court interpreted Article I, Section 9 to afford greater protection than the Fifth Amendment of the United States Constitution. Specifically, *Triplett* held that an accused could not be impeached by his own statements, even though voluntary, when the statements had been suppressed.

The holding in *Triplett* was in direct contradiction to the holding of the United States Supreme Court in *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). In

*Triplett,* just as in *Harris,* the accused had made statements upon arrest which were suppressed on the basis that he had not been given his *Miranda* warnings. During the *Harris* trial, the accused took the stand and testified in a manner inconsistent with the earlier suppressed statements. The prosecution then used the suppressed statements to impeach the credibility of the accused. On appeal, Harris argued that the use of the impeached statements violated his Fifth Amendment right against self-incrimination. The United States Supreme Court disagreed, stating that "[t]he shield provided by *Miranda* [*v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ] cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." *Harris,* 401 U.S. at 226, 91 S.Ct. at 646.

This Court rejected *Harris* and found that the protection of Article I, Section 9 was more expansive. In *Triplett,* we held that once a statement has been found constitutionally infirm it could not be utilized against the accused. In direct response to *Triplett,* the 1984 amendment to Article I, Section 9 was adopted.[7] Of particular significance in the process of passing the amendment is this passage taken from the Senate debate; the Speaker is Senator Greenleaf who proposed the bill which ultimately became the 1984 amendment:

> Mr. President, Senate Bill No. 496 is in support of and in conformance with the United States Supreme Court decision of *Harris v. New York* in which the majority opinion held that it is not a violation of the United States Constitution to introduce a previously suppressed voluntary statement of a defendant to impeach his credibility once he takes the stand. They reasoned to allow otherwise would allow legalized perjury.

. . . . .

7. The amendment, as set forth above within the entire text of Article I, Section 9, states: "The use of a suppressed voluntary admission or voluntary confession to impeach the credibility of a person may be permitted and shall not be construed as compelling a person to give evidence against himself."

The Pennsylvania Supreme Court, ultimately, in the *Triplett* case, came down with a different decision and found that such a procedure was a violation of the Pennsylvania Constitution, although the United States Supreme Court, as I indicated before, has found that it was not a violation of the United States Constitution.

A review of both provisions would indicate that they are almost identical and that it was really a difference of philosophy rather than a difference in law.

Mr. President, I think it is incumbent upon this Legislature to rectify this wrong.

*Legislative Journal–Senate,* S.B. 496, p. 790, June 9, 1981.

In drafting the 1984 amendment, the legislators intended to ensure that the protection against self-incrimination under Article I, Section 9 would be interpreted similarly to the Fifth Amendment of the United States Constitution which states: "No person ... shall be compelled in any criminal case to be witness against himself." A comparison of the actual language in Article I, Section 9 and the Fifth Amendment does not reveal any major differences in the description of the privilege against self-incrimination within the two Constitutions. As the words themselves are not persuasive of either interpretation on the issue at bar, we turn to the prior decisions of this Court which interpreted the right against self-incrimination as contained within the Pennsylvania Constitution.

## II. History

In reviewing the history of Article I, Section 9 we find that the earliest decisions of this Court considering the scope of the right against self-incrimination under our Constitution extended the privilege to protection of a citizen's reputation. In *Commonwealth v. Gibbs,* 3 Yeates 429 (1802), this Court found that the privilege must be broadly interpreted to include not only answers which would incriminate the witness in criminal conduct, but also to protect the witness from answering any

questions which would bring him into "disgrace or infamy." *Id.* at 437.

This concept of protection to reputation was again addressed by the Court in *Lessee of Galbreath v. Eichelberger,* 3 Yeates 515, in 1803. *Galbreath* was concerned with a fraudulent transfer of title which had allegedly taken place in order to avoid a creditor. When faced with questions regarding the transfer, the witness asserted his protection against self-incrimination. The Court agreed that the witness could not be compelled to answer, even though the information probably would not result in a criminal indictment, but because the nature of the accusation was "nefarious and immoral, and would subject every person concerned in it to ignomy and contempt." *Id.* at 516.

Although *Gibbs* and *Galbreath* interpreted Article I, Section 9 to include protection from incriminating information that would damage reputation, they did not address the question of whether an immunized witness would be required to forsake the constitutional privilege and answer questions exposing him to "ignomy and contempt." It was not until after the United States Supreme Court decision in *Counselman v. Hitchcock,* 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892), that this Court addressed the question of immunity in relation to the privilege against self-incrimination.

In *Counselman,* the United States Supreme Court rejected a federal statute which conferred only use immunity as being an insufficient substitute for the privilege guaranteed under the Fifth Amendment. In reaching its decision, the *Counselman* Court reviewed the language of various state constitutions containing similar guarantees against self-incrimination, including the Pennsylvania Constitution. *Counselman,* 142 U.S. at 565, 12 S.Ct. at 199. The Court concluded that any differences in the language of the provisions themselves as between the various states and the federal constitution were irrelevant as the "manifest purpose" of all of the constitutions examined was the same, to protect the witness

"from being compelled to disclose the circumstances of his offense, the sources from which, or the means by which, evidence of its commission, or of his connection with it, may be obtained, or made effectual for his conviction, without using his answers as direct admission against him."

*Counselman,* 142 U.S. at 585, 12 S.Ct. at 206, *quoting Emery's Case,* 107 Mass. 172, 182 (1871).

The Court then went on to conclude that a statutory grant of immunity, in order to be valid as against the Fifth Amendment, "must afford absolute immunity against future prosecution for the offense to which the question relates." *Counselman,* 142 U.S. at 586, 12 S.Ct. at 206. In the wake of *Counselman,* only those legislative grants of immunity which compelled testimony from a witness in exchange for transactional immunity were found to be valid. *See Petition of Specter, Riccobene Appeal,* 439 Pa. 404, 268 A.2d 104 (1970).

Thus, from 1892 until 1978, Pennsylvania recognized only transactional immunity as a sufficient exchange for compelling a witness to forsake the privilege against self-incrimination.[8] The courts in Pennsylvania followed the lead of the United States Supreme Court on this issue. *In re Falone,* 464 Pa. 42, 346 A.2d 9 (1975); *Riccobene Appeal,* 439 Pa. 404, 268 A.2d 104 (1970); *Commonwealth v. Carrera,* 424 Pa. 551, 227 A.2d 627 (1967); *Commonwealth v. Katz,* 414 Pa. 108, 198 A.2d 570 (1964); *Commonwealth v. Kilgallen,* 379 Pa. 315, 108 A.2d 780 (1954); *Commonwealth v. Frank,* 159 Pa.Super. 271, 48 A.2d 10 (1946); *In re Contempt of Myers,* 83 Pa.Super. 383 (1924); *In re Kelly,* 200 Pa. 430, 50 A. 248 (1901).

8. Transactional immunity was granted only within the criminal context. The Pennsylvania Constitution of 1874 specifically provided for use immunity in two instances. Article III, Section 32, which has since been repealed, provided that in investigations concerning the bribery of public officials a witness could not refuse to testify on the basis of his right against self-incrimination. In exchange for his testimony the witness was guaranteed that "such testimony shall not afterwards be used against him in any judicial proceeding, except for perjury in giving such testimony." Also, in Article VIII, Section 10 of the 1874 Constitution the same guarantee of use immunity in exchange for compelled testimony was set forth for witnesses called in the investigation of contested elections. This section of the Constitution is still in place having been re-numbered at Article VII, Section 8.

The Pennsylvania Legislature also adhered to the dictates of the United States Supreme Court when drafting legislation on the issue of immunity grants for witnesses. Prior to the 1978 revisions, which are at issue in this case, the immunity conferred under the Act was transactional immunity.[9] This shift in the type of immunity authorized by the Act can easily be traced to the United States Supreme Court decision in *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

In *Kastigar*, the United States Supreme Court found use and derivative use immunity to adequately protect the privilege against compulsory self-incrimination contained within the Fifth Amendment. The Court reconsidered its opinion in *Counselman* and determined that although use immunity offers insufficient protection under the Fifth Amendment, transactional immunity offers greater protection than is necessary and thus concluded that use and derivative use immunity would thereafter be sufficient.

We hold that such immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege. While a grant of immunity must afford protection commensurate with that afforded by the privilege, it need not be broader. Transactional immunity, which accords full immunity from prosecution for the offense to which the compelled testimony relates, affords the witness considerably broader protection than does the Fifth Amendment privilege. The privilege has never been construed to mean that one who invokes it cannot subsequently be prosecuted. Its sole concern is to afford protection against being "forced to give testimony leading to the infliction of 'penalties affixed to ... criminal acts.'" [footnote omitted]. Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, affords this protection. It prohibits the prosecu-

9. Transactional immunity was provided in the Act of July 28, 1953 (P.L. 723 § 3203) (16 P.S. § 6203); the Act of August 9, 1955 (P.L. 323 (No. 130), § 2803) (16 P.S. § 2803) and the Act of November 22, 1968 (P.L. 1080, No. 333) (19 P.S. § 640.1 et seq.).

torial authorities from using the compelled testimony in any respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness. *Kastigar,* 406 U.S. at 453, 92 S.Ct. at 1661. [emphasis in original].

This shift by the United States Supreme Court away from transactional immunity in favor of use and derivative use immunity was commented upon by this Court in *In re Falone,* 464 Pa. 42, 346 A.2d 9 (1975). In *Falone,* this Court upheld the grant of transactional immunity provided under the previous version of the present Act with the declaration that:

A grant of immunity is sufficient to supplant the privilege if the witness is protected against use of the compelled testimony and all its fruits. *Kastigar v. United States, supra.* Immunity granted under the Act is "transactional" immunity, *Riccobene Appeal, supra.* 439 Pa. at 412, 268 A.2d at 109, and thus is more extensive than necessary to displace the privilege.

*Falone* at 47, 346 A.2d at 12. Following this Court's decision in *Falone,* the immunity statute was revised to its present form wherein transactional immunity was replaced with use and derivative use immunity.

This case presents the first opportunity for this Court to consider the constitutionality of the 1978 revision of 42 Pa.C.S. § 5947.[10] Based upon the above review of our prior cases on the privilege against self-incrimination, and the history of the legislative grant of immunity which impacts upon that privilege, it is clear that Pennsylvania, for the most part, followed the lead of the United States Supreme Court.[11] There are two

10. This Court discussed the question of who could grant immunity under this statute in *Commonwealth v. Johnson,* 507 Pa. 27, 487 A.2d 1320 (1985). The constitutionality of the statute itself was not presented in that case.

11. In *Commonwealth v. Marra,* 527 Pa. 526, 594 A.2d 646 (1991), this Court at footnote 2 stated that "the privilege against compulsory self-incrimination contained in the Pennsylvania Constitution is coextensive with that of the federal constitution and is governed by federal standards." The *Marra* Court cited *Commonwealth v. Carrera,* 424 Pa. 551,

points at which Pennsylvania could be said to have deviated from the lead of the United States Supreme Court.

First, Pennsylvania has always interpreted the protection afforded an individual under the self-incrimination clause of Article I, Section 9 to extend to questions which would damage the reputation of the witness. *See Gibbs* and *Galbreath.* However, the testimony at issue in *Gibbs* and *Galbreath* was not compelled from the witness under a grant of immunity: thus, the relevancy of those decisions to the issue at bar is questionable.[12]

The second departure from the lead of the United States Supreme Court occurred in the decision in *Commonwealth v. Triplett. Triplett,* however, was specifically overruled by the 1984 Constitutional Amendment to Article I, Section 9.

■ Having reviewed our prior case law, it comes as little surprise that Pennsylvania followed the decisions of the United States Supreme Court in the area of immunity. Through its decisions the United States Supreme Court set the minimum level of protection guaranteed by the Declaration of

227 A.2d 627 (1967) for that proposition. *Carrera,* however, did not so state. Rather, in *Carrera* the Court stated:

> The privilege afforded against compulsory self-incrimination by the Fifth Amendment to the United States Constitution is now protected under the Fourteenth Amendment against abridgment by the states [citations omitted]. The privilege, if properly invoked in a state proceeding, is governed by federal standards.

*Carrera,* 424 Pa. at 552–3, 227 A.2d at 629. Accordingly, we do not find the footnote in *Marra* as persuasive authority on the question of whether or not Article I, Section 9 is coextensive with the Fifth Amendment.

12. We note that in *D'Elia v. Pennsylvania Crime Commission,* 521 Pa. 225, 555 A.2d 864 (1989), Mr. Justice Zappala, writing for a plurality of the Court, found *Gibbs* and *Galbreath* to be persuasive authority in reaching his conclusion that only transactional immunity would offer sufficient protection to a witness compelled to forsake his privilege under Article I, Section 9 of our Constitution. However, we find *D'Elia* to be strictly limited to its facts which involved testimony being compelled from a witness before the Crime Commission, a body not recognized as empowered to grant immunity under the Act at issue. Our conclusion is based upon the fact that only two members of the *D'Elia* Court joined in the opinion of Mr. Justice Zappala, while the other four members of the Court joined in the concurring opinion of Mr. Justice Papadakos. Clearly a majority of the court failed to endorse the reasoning set forth in *D'Elia.*

Rights, under which the states must not fall. *See Commonwealth v. Sell,* 504 Pa. 46, 470 A.2d 457 (1983). Up until the *Kastigar* decision in 1972, the United States Supreme Court afforded the most extensive protection available to a witness being compelled to testify: transactional immunity. Thus, the states had no ability to provide greater protection under their own constitutional provisions of like character because the law could provide no greater protection. Therefore, a review of what our sister states have decided on the issue of self-incrimination and legislative grants of immunity since *Kastigar* would be most instructive.

### III. Related Case Law from other States

Turning to our sister states, we find that they are evenly split on the issue of whether their state constitutions afford protection against compulsory self-incrimination greater than the Fifth Amendment in the wake of *Kastigar.* The six states that have rejected *Kastigar* and found their constitutions to require transactional immunity are South Carolina, *State v. Thrift,* 312 S.C. 282, 440 S.E.2d 341 (S.C.1994); Alaska, *State v. Gonzalez,* 853 P.2d 526 (Alaska 1993); Mississippi, *Wright v. McAdory,* 536 S.2d 897 (Miss.1988); Oregon, *State v. Soriano,* 68 Or.App. 642, 684 P.2d 1220 (1984); Massachusetts, *Attorney General v. Colleton,* 387 Mass. 790, 444 N.E.2d 915 (1982); and Hawaii, *State v. Miyasaki,* 62 Haw. 269, 614 P.2d 915 (1980).[13]

---

**13.** Eleven jurisdictions provide for transactional immunity through legislation. *People v. Campbell,* 137 Cal.App.3d 867, 187 Cal.Rptr. 340 (1983), interpreting Cal.Penal Code § 1324; *Dutton v. District Court,* 95 Idaho 720, 518 P.2d 1182 (1974), referring to Idaho Code § 19–1115; *People v. Fitzgerald,* 66 Ill.2d 546, 6 Ill.Dec. 888, 363 N.E.2d 835 (1977), interpreting Ill.Rev.Stat. ch. 725, para. 5/106–2; *State v. Hanson,* 342 A.2d 300 (Maine 1975), interpreting Me.Rev.Stat.Ann. tit. 15 § 1314–A; *People v. Schmidt,* 183 Mich.App. 817, 455 N.W.2d 430 (1990) interpreting Mich.Comp.Laws Ann. § 780.701; Nev.Rev.Stat. §§ 178.572, 178.574, 178.576 (1979); N.H.Rev.Stat.Ann. § 516:34 (1993); *State v. Paquette,* 117 R.I. 638, 369 A.2d 1096 (1977), interpreting R.I.Gen.Laws 1956 § 12–17–15; Utah Code Ann. § 77–22–3 (1995); *State v. McCullough,* 49 Wash.App. 546, 744 P.2d 641 (1987), interpreting Wash.Rev. Code Ann.Crim.Rule 6.14; *State ex rel. Brown v. MacQueen,* 169 W.Va. 56, 285 S.E.2d 486 (1981), interpreting W.Va.Code § 57–5–2.

In each of the cases cited, the state courts, relying upon their constitutional self-incrimination clauses, rejected legislation that had been developed post-*Kastigar* replacing transactional immunity with use/derivative use immunity. South Carolina and Alaska found the protection of use/derivative use immunity to be too cumbersome to enforce, citing the practical problems in determining whether or not later prosecutions stemmed from the immunized testimony. *Thrift*, 440 S.E.2d at 350; *Gonzalez*, 853 P.2d at 530. Mississippi had the same practical reasons for rejecting *Kastigar* as South Carolina and Alaska. Mississippi more bluntly phrased the problem as being one of having to rely upon the good faith of the prosecutor in use/derivative use situations. The *Wright* Court concluded:

> When a prosecutor decides to grant immunity to a witness such as John Wright—and thus strip that witness of his right to remain silent, he must be prepared to make final peace with that witness, subject only to a possible perjury charge. To assure that this be so, we hold that Article 3, Section 26 of the Mississippi Constitution requires a transactional immunity grant.

*Wright*, 536 S.2d at 903–904.

Oregon found the rationale of *Kastigar* unpersuasive and chose to remain consistent with their case law which had always followed the reasoning of *Counselman*. The Massachusetts Courts also rejected *Kastigar* in favor of remaining consistent with *Counselman*. Of course, Massachusetts pointed out that the rationale of *Counselman* was taken from their holding in *Emery's Case*, 107 Mass. 172 (1871); thus, their decision to require transactional immunity under the Massachusetts constitution predated that of the United States Supreme Court. Hawaii flatly rejected use/derivative use immunity. The *Miyasaki* Court reasoned that a legislative enactment that provided less than transactional immunity could not supplant the constitutional privilege against self-incrimination. *Miyasaki*, 614 P.2d at 923.

The six states which have found use and derivative use immunity consistent with the self-incrimination clauses in their

state constitutions are New Jersey, *State v. Strong*, 110 N.J. 583, 542 A.2d 866 (1988); New York, *People v. Johnson*, 133 Misc.2d 721, 507 N.Y.S.2d 791 (N.Y.Sup.Ct.1986); Maryland, *In re Criminal Investigation No. 1–162*, 307 Md. 674, 516 A.2d 976 (1986); Arizona, *Patchell v. State*, 147 Ariz. 508, 711 P.2d 647 (Ct.App.1985); Indiana, *In re Caito*, 459 N.E.2d 1179 (Indiana 1984); and Texas, *Ex Parte Shorthouse*, 640 S.W.2d 924 (Tex.Crim.App.1982).[14] Each of the jurisdictions which accepted use and derivative use immunity grants as consistent with their state constitutions found the state constitutional privilege at issue to be coextensive with the Fifth Amendment, except for New Jersey.

The New Jersey Court found their state privilege against self-incrimination to be more expansive than the Fifth Amendment as it includes a privacy interest that may be implicated through compelled testimony. *Strong*, 542 A.2d at 872, *citing In the Matter of Grand Jury Proceedings of Guarino*, 104

---

**14.** Eighteen jurisdictions have provided for use/derivative use immunity through legislation passed after *Kastigar*. Ark.Code Ann. § 16–43–603 (1994); *People v. Reali*, 895 P.2d 161 (Colo.Ct.App.1994), interpreting Colo.Rev.Stat.Ann. § 13–90–118; *State v. Williams*, 536 A.2d 583 (Conn.1988), interpreting Conn.Gen.Stat.Ann. § 54–47a (which permits use/derivative use and transactional immunity); *State v. Conner*, 295 A.2d 704 (Del.Super.1972), interpreting 11 Del.Code Ann. § 3508; *DeBock v. State*, 512 So.2d 164 (Fla.1987), *cert. denied* by *DeBock v. Florida*, 484 U.S. 1025, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988), interpreting Fla.Stat.Ann. § 914.04; *Corson v. Hames*, 239 Ga. 534, 238 S.E.2d 75 (1977), interpreting Ga.Code Ann. § 38–1715; *Matter of Girdler*, 357 N.W.2d 595 (Iowa 1984), interpreting Iowa Code Ann. § 813.2 Rule 19 subd. 3; *In re Birdsong*, 216 Kan. 297, 532 P.2d 1301 (1975), interpreting Kan.Stat.Ann. § 22–3415 (which permits use/derivative use and transactional immunity); *State v. Cinel*, 619 So.2d 770 (La.App.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1398, 128 L.Ed.2d 71 (1994), interpreting La.Code Crim.Proc.Ann. art. 439.1; *State v. Kingbird*, 412 N.W.2d 350 (Minn.App.1987) review denied Nov. 6, 1987, interpreting Minn.Stat.Ann. § 609.09; *State v. Myrhow*, 262 Mont. 229, 865 P.2d 231 (1993), relying upon Mont.Code Ann. § 46–15–331 (which allows use/derivative use and transactional immunity); *State v. Richard*, 228 Neb. 872, 424 N.W.2d 859 (1988), referring to Neb.Rev.Stat. § 29–2011.02; *State v. Vallejos*, 118 N.M. 572, 883 P.2d 1269 (1994), interpreting N.M.Stat.Ann. § 31–6–15; N.C.Gen.Stat. § 15A–623 (1988); *In re contempt of Grajedas*, 515 N.W.2d 444 (N.D.1994), interpreting N.D.Cent.Code § 31–01–09; *State v. Abraham*, 318 N.W.2d 775 (S.D. 1982), referring to S.D.Codified Laws Ann. § 23A–14–29; Vt.Stat.Ann. tit. 12 § 1664; and, Wis.Stat.Ann. §§ 972.08, 972.085.

N.J. 218, 516 A.2d 1063 (1986). Although New Jersey found their state privilege more expansive than the Fifth Amendment, it did not find the grant of use/derivative use immunity to be inconsistent with that privilege. The Court focused its concern in protecting the privacy rights of its citizens on the consequences of a later prosecution of an immunized witness. In order to preserve this privacy interest and also permit compelled testimony through use/derivative use immunity, the Court held that strict scrutiny would be applied to the state's attempt to prosecute a witness who had previously testified under an immunity grant.

[T]he state must prove that such evidence was developed or obtained from sources or by means entirely independent of and unrelated to the earlier compelled testimony. The bar is against the prosecutorial use of any and all evidence that would not have been developed or obtained but for the compelled testimony.

Consistent with the important interests to be served by these strict standards, we further hold that the burden of proof imposed on the State must be by "clear and convincing" evidence. No less a burden of proof will suffice to entitle the State to engage in a prosecution of a witness who has given earlier compelled testimony under a government grant of immunity.

*Strong* at 596, 542 A.2d at 872.

In reviewing the relevant opinions and legislation from our sister states we find no clear preference among the jurisdictions. What appears most striking among the courts which reject use/derivative use immunity is the concern for the practical effect of separating out the information garnered from the compelled testimony when later prosecuting the individual. It is this fear that the individual will be condemned by his/her own words, even inadvertently, which caused South Carolina, Alaska, Mississippi, and to some extent, Oregon, to reject use/derivative use immunity as inconsistent with the protection from self-incrimination found within their state constitutions. New Jersey, which accepted use/derivative use immunity, also focused heavily on this problem in

reaching their decision. To complete our analysis of this issue we now turn to a consideration of policy concerns which would affect our conclusion.

## IV. Policy Considerations

 This case involves the juxtaposition of the privilege against self-incrimination and the need to compel testimony. The inherent conflict between these two important concepts is the heart of this case. Each of these concepts carry historical baggage of considerable proportion. Our system of jurisprudence abhors the ancient star chamber inquisitions which forced a witness into "the cruel trilemma of self-accusation, perjury or contempt." *Marra*, 527 Pa. at 530 n. 3, 594 A.2d at 647–8 n. 3. On the other hand, of equal importance to our system of justice is the ancient adage that "the public has a right to every man's evidence." *Kastigar*, 406 U.S. at 443, n. 5, 92 S.Ct. at 1655, n. 5. The concept of compelling a witness to testify has been recognized in anglo-american jurisprudence since the Statute of Elizabeth, 5 Eliz. 1, c 9, § 12 (1562). Immunizing a witness has always been a feature of Pennsylvania jurisprudence.[15] The dilemma in balancing these competing concerns centers on the type of immunity which can best provide the public with the information to which it is entitled in order to ferret out criminal activity and at the same time protect the rights of the witness being forced to testify under compulsion.

In urging this Court to declare the present immunity statute unconstitutional, DeBlase places great emphasis on the fact that Pennsylvania has historically required transactional immunity as the only adequate safeguard for compelling a witness' testimony in violation of the right against self-incrimination. As with most critics of use/derivative use immunity, DeBlase asserts that only transactional immunity can truly protect a witness from later being condemned by his own

---

**15.** In 1758 the Pennsylvania legislature enacted immunity legislation. *See, e.g.,* Resolution of Jan. 6, 1758, in Votes and Proceedings of the House of Representatives of the Province of Pennsylvania 1682–1776, 6 Pennsylvania Archives (8th series), 4679 (C. Hoban ed. 1935).

words. The strongest argument for rejecting use/derivative use immunity is what has been commonly referred to as the "web effect." This web which weaves itself into the circumstances surrounding a later prosecution of a witness who had been compelled to testify was described in the plurality opinion of Mr. Justice Zappala in *D'Elia* as follows:

By invoking the privilege one retains the security that comes with knowing that the government is left to its own devices to ascertain illegality and produce evidence. If one is compelled to testify, though, that security vanishes entirely and the individual cannot help but wonder if he is now caught in an untraceable web of effects that might lead to the ordeal of a trial, regardless of how innocuous the questioning might appear. Only an immunity that prevents the risk of such ordeal can duplicate the effect of invoking the privilege.

*D'Elia*, 521 Pa. at 239, 555 A.2d at 871.

In fact in the instant case DeBlase argues that if forced to testify against his co-conspirator he will forever be caught within the web and his ability to receive a fair trial forever tainted. Specifically, the untraceable effects of his immunized testimony will impact upon the selection of his jury, the presentation of a defense, the ability to utilize character witnesses and infringe upon his decision to testify in his own behalf. The practical consequences of rejecting transactional immunity and leaving a witness clothed in only the protection of use/derivative use immunity constitutes the most salient argument against the constitutionality of 42 Pa.C.S. § 5947.

 On the other hand, there is no dispute that immunization of a witness is a necessary, effective and ancient tool in law enforcement. As the United States Supreme Court stated in *Kastigar*, "many offenses are of such a character that the only persons capable of giving useful testimony are those implicated in the crime." *Kastigar*, 406 U.S. at 446, 92 S.Ct. at 1656. The very nature of criminal conspiracies is what forces the Commonwealth into the Hobson's choice of having to grant one of the parties implicated in the criminal scheme

immunity in order to uncover the entire criminal enterprise. Thus, in order to serve justice an accommodation must be made, however, that arrangement should not place the "witness" in a better position as to possible criminal prosecution than he had previously enjoyed. A grant of immunity should protect the witness from prosecution through his own words, yet it should not be so broad that the witness is forever free from suffering the just consequences of his actions, if his actions can be proven by means other than his own words.

 Clearly, there are compelling "pros" and "cons" on the question of the right against self-incrimination versus the need to immunize the witness. However, to elevate the right against self-incrimination above the right of the public to every person's evidence would not achieve a proper balance of these competing interests. Transactional immunity offers complete *amnesty* to the witness, a measure of protection clearly greater than the privilege against self-incrimination. The practical consequences, otherwise known as the "web effect," created by immunizing a witness should not tip the balance so far in favor of the witness that the Commonwealth is only left with the option of granting complete amnesty to a witness in order to fully investigate criminal enterprises and serve the public need for justice. Use/derivative use immunity strikes a better balance between the need for law enforcement to ferret out criminality and the right of the witness to be free of self-incrimination.

### Conclusion

 As stated above, DeBlase is asking this Court to find that the Pennsylvania Constitution requires greater protection under Article I, Section 9, than that guaranteed under the Fifth Amendment to the United States Constitution. In *Edmunds*, this Court stated that we will enforce the distinct provisions of our Constitution which may supersede the minimum guarantees flowing to the states from the Federal Constitution through the Fourteenth Amendment, when there are adequate and independent grounds to do so resting squarely upon decisions grounded in Pennsylvania jurisprudence. *Ed-*

*munds,* 526 Pa. at 390, 586 A.2d at 895, *citing Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). In this case we find that Article I, Section 9 is, in fact, more expansive than the Fifth Amendment; it is not, however, so expansive that the privilege against self-incrimination would require greater protection than that provided within the Act. We reach this conclusion after reviewing all of the above factors which provide us with the following considerations.

First, from our review of the text of the Pennsylvania Constitution we can see a strong sentiment within this Commonwealth, as recently expressed through the 1984 amendment to Article I, Section 9, in favor of interpreting the constitutional privilege against self-incrimination similarly to the same privilege contained in the Fifth Amendment of the United States Constitution.

Second, the historical review of our caselaw interpreting Article I, Section 9 shows that we have generally followed the lead of the United States Supreme Court on this issue. This point must be considered, however, in light of the fact that until *Kastigar* in 1972, federal caselaw offered the greatest degree of protection available to an immunized witness in exchange for compelled testimony, and thereby set a minimum floor to which all states were bound. The other important factor learned from the history of Article I, Section 9 is that the clause has consistently been expanded to include protection to reputation, an element not recognized by the federal courts.

Third, related caselaw reveals no great weight of authority for either approach to this question. Although the focus of our sister states on the practical problems which arise in later prosecutions of witnesses who have been granted use/derivative use immunity, is an important consideration for us in reaching our ultimate conclusion.

Finally, in turning to policy matters, we find that use/derivative use immunity can best achieve the necessary balance between the right to protect a witness from giving evidence

against himself and the right of the public to compel every person's testimony.

In order to effectuate the balance which will uphold the constitutionality of the Act and simultaneously preserve the protection from compelled self-incrimination as it has been historically interpreted in Article I, Section 9, we find the decision of the learned Supreme Court of New Jersey in *Strong* to be most compelling and illustrative.

Recognizing the serious practical concerns which almost always accompany a later prosecution of the immunized witness, we hold that in the later prosecution, the evidence offered by the Commonwealth shall be reviewed with the most careful scrutiny. That is, the Commonwealth must prove, of record, by the heightened standard of clear and convincing evidence, that the evidence upon which a subsequent prosecution is brought arose *wholly* from independent sources.

Therefore, with our adoption of this standard of proof, we dismiss DeBlase's second allegation of error, that to bring him to trial after compelling his testimony in the trial of his co-conspirator would deprive him of due process. The due process concern shall be properly addressed by requiring the Commonwealth to establish, by clear and convincing evidence, its independent evidence on which the prosecution is based.

Accordingly, for different reasons, the decision of the Superior Court is affirmed and this matter is remanded to the trial court for further proceedings consistent with this opinion. Jurisdiction of this Court is relinquished.

MONTEMURO, J., is sitting by designation.